# Kentucky-Tennessee Light & Power Co. v. Fitch.

November 15, 1946.

As Modified and Extended on Denial of Rehearing May 6, 1947.

Robert M. Coleman, Judge.

Lynne A. Warren and James W. Stites for appellant and cross-appellee.

Robert P. Hobson, Woodward, Dawson, Hobson & Fulton and Hardin & Hardin for appellee and cross-appellant.

OPINION OF THE COURT BY JOHN MARSHALL, JR., SPECIAL JUDGE—Reversing.

The Company sues Fitch—until 1937 its General Manager—for moneys which it claims he misappropriated and for the fair value of gas, electricity, the services of many named employees, and other Company property which it claims he converted to his own use. The moneys, it alleges, were taken between January 1, 1928, and September 3, 1936, from the proceeds of the sale of ice and the rental of cold storage space at its two ice plants in Bowling Green. The total recovery sought is $189,682.89.

When all proof had been taken, the case was referred to a special master, who held that the company should recover $91,208.58 for ice moneys, $8,332.53 for cold storage rentals, and $14,643.67 for labor and other Company property. The court disagreed with the master as to the amount of recovery and entered judgment for $45,000, made up of $35,000 for embezzled ice and

cold storage moneys and $10,000 for labor, materials, and other miscellaneous items.

The Company appeals. It asks that the judgment be increased from $45,000 to $189,739.42. Fitch cross-appeals. He insists that the testimony is wholly insufficient to support any judgment against him. We are unable to agree with either.

The master denied recovery for the services of a Company employee, Ferrell, who admittedly worked as a servant in Fitch's home from 1927 to 1937. The Company excepted. The court overruled the exception. This, we think, was error.

Unless the liability arising from Fitch's admission that this Company employee worked many hours a day for him was overcome by proof of an affirmative defense, the Company should have recovered. Fitch pled several. One is that Ferrell was directed by the Company to work for Fitch as "part of his duties." This is but to say that Ferrell's services were part of Fitch's salary. Another is that Fitch permanently injured his leg in the Company's service and that, "recognizing his partial incapacity," the Company directed Ferrell and other employees to "work around his house." The third defense is a custom, said to have grown up when the Company was owned by Fitch's parents,[1] of permitting Company employees "when not otherwise engaged, to do services for the executive officers." Ratification is also alleged. We are unable to find credible evidence to support any of these affirmative pleas. There is no showing that Ferrell's services were part of Fitch's salary. There is no substantial proof of the custom. Fitch's leg was broken in 1916. Ferrell began to work for him in 1927. We cannot believe that Ferrell's services, which we consider worth $7,500, were given in belated settlement of a personal injury claim, long before barred by limitations. Nor are we convinced that those with power to ratify did so.

The $10,000 recovery for other labor and the miscellaneous items is supported by substantial testimony

---

1 In 1922 the Company became a subsidiary of Associated Gas & Electric Co., a New York corporation holding the stock of many operating public utilities and sub-holding companies.

and, in many instances, by Fitch's admissions. The total recovery for labor and the miscellaneous items, therefore, should have been $17,500.

But the $35,000 recovery for ice receipts and cold storage rentals cannot stand. Prior to August 1932 the Company operated two ice plants near Bowling Green. One called the Delafield or No. 1 plant, was about a mile out of town. The other, known as the No. 2 plant, was about the same distance from Bowling Green. When the Company acquired that plant, Colonel Will Jones, a former mayor of Bowling Green, was managing it. He was retained and put in charge of renting out cold storage space and collecting the rentals. He also played an important part, the extent of which is disputed, in computing and transporting the day's receipts to the Company's office in Bowling Green. His integrity and honesty were of the highest.

At each plant oblong cans were filled with water and placed in a tank of brine and there frozen into ice. The resultant ice cake weighs 300 pounds and is commonly referred to as a can or block. The Delafield plant could produce 40 tons of ice per day. The daily capacity of the No. 2 plant was 60 tons.

The Company had formerly made ice at Cave City. But during the years in question, the ice for Cave City distribution was made in Bowling Green. Considerable ice was sold to refrigerate the cars carrying Warren County's annual strawberry crop to the market. Some ice was used to cool the Company's uptown office. Ice was supplied free to the Company officers and employees until August 1, 1933.

But the bulk of the ice produced at Bowling Green was sold to operators of ice routes—referred to as peddlers—who resold to the consumer. Small quantities of ice (10 to 50 lbs.) were sold at the plant direct to consumers, who paid for it on delivery. Ice sold to them was called retail ice. All ice sold, except that for car-icing, was delivered to the buyer on the loading platform at the plant by employees, called platform men. Several peddlers paid monthly at the uptown office. Sales to them were recorded in the Company's books as credit sales. The others paid, either in currency or by check, at the plant. All sales of ice paid for at the plant,

whether to peddler or consumer and whether paid for in currency or by check, were recorded on those books as "cash" sales. Most of the ice sold peddlers was sold at 30 cents per cwt. ($6 per ton). All retail ice was sold at 40 cents per cwt.

When a peddler bought ice a serially numbered "ice ticket" was filled out by the platform man. For separation into two parts the ticket was bisected by a row of indentations. Each part had lines to be filled in with the name of the buyer, the date, the quantity of ice bought, the price per cwt., and the total price paid or charged. One portion—that to be retained by the Company—contained a receipt for the buyer to sign. But for that, each portion of the ticket was a duplicate or replica of the other. The serial number appeared on each. No ticket was made out when retail ice was sold.

If the ice was to be paid for at the end of the month, the Company's portion of the ticket, so marked, was signed by the buyer and placed in a cash register on the loading platform. When ice was paid for on delivery, the price, either in currency or check, was placed in the register, along with the Company's portion of the ticket—which, however, the buyer did not sign. Daily, towards evening, the register was emptied of currency, checks, and tickets. These were taken into the plant office and sorted and counted. Some currency was replaced in the register for making change. All agree that tickets made out for ice paid for at the plant were then destroyed, and that checks, currency, and the tickets for credit sales were put into a "two or three pound paper bag," kept on hand for that purpose. There is disagreement with respect to by whom and when those bags were taken to the Company office uptown. Be that as it may, bags containing the day's checks, currency, and credit tickets were carried by Fitch, either alone or accompanied by Colonel Jones, to that office. There they frequently remained in the safe overnight. In the morning the "cash" in the bag was added to the cash received from the electric and gas departments, and deposited in bank.

There is no claim that, during the critical years, Fitch, himself, collected any appreciable amount of currency from peddlers or cold storage customers. There is no claim that he robbed the cash register. There is

no evidence that any check payable to the Company reached Fitch's pockets. Therefore, the maximum amount of ice proceeds and cold storage rentals which Fitch could have taken, as charged, is limited to the amount of currency paid in at the plants either for ice or for cold storage space. And manifestly any such currency must have been taken by Fitch either after it left the cash register and before it was placed in the bag or while he was taking or accompanying, the bag to the Company's office.

The Company cannot even lay the foundation of a claim for misappropriated ice and cold storage moneys unless and until it proves that some of the currency taken in at the plant did not reach the Company's bank account. And it must establish that indispensable fact before it may argue that Fitch, considering him to be a fiduciary, must assume the burden of showing that the currency which failed to reach the bank also failed to reach his pockets.

The Company relies on the testimony of Hugh Jenkins, chief engineer at the Bowling Green ice plants from March 20, 1926, to October 31, 1937, that of certain employees at those plants, and upon a report prepared by its auditor—of which more later. The star witness is Jenkins. His testimony, if believed, is more than sufficient to convict Fitch. Jenkins claims that he took ice moneys for Fitch and concealed thefts by falsifying the reports of ice produced, but that he never profited, even to the slightest degree, from them. The other employees do no more than describe incidents which might, or might not, justify an inference that Fitch was guilty. Their testimony, unaided by that of Jenkins, falls far short of sustaining the Company's burden of showing that some ice and cold storage currency reached Fitch's pockets. The pivotal question, therefore, is: Can Jenkins' testimony be accepted?

His veracity is attacked, not only by witnesses for Fitch, but also by witnesses for the Company. The weight of Jenkins' testimony is diminished by his intense hostility to Fitch, which frequently peeped through his pose of respectful deference and obedience to his superior by which he sought to conceal it, and by which he attempted to excuse the leading role which he says

he played in the theft of the ice moneys. His testimony is riddled with contradictory and, even incredible statements. It shows that Jenkins could not refrain from making categorical statements—no matter how improbable—when supposedly helpful to the Company's cause.

Jenkins divided Fitch's alleged peculations into two periods by the method claimed to have been employed. During the first period, so Jenkins says or infers, Fitch took the currency either just before it went into the daily money bag, or while carrying the bag to the uptown office. The production of ice was reported to the office only at the end of each month. According to Jenkins, detection was avoided by daily destroying the cash ice tickets and by his under-reporting the month's production by the number of tons given him by Fitch who, Jenkins said, could do so because he "knew how much money he had taken out of this budget." Though Jenkins is very positive about the procedure followed in the first period he is unable to fix with any degree of accuracy either when it began or ended.

He was asked how often he deducted the number of tons supplied him by Fitch. He answered: "It happened every month after we started * * * It happened right at the end of the Delafield plant * * *. The last two years we was there was when it started."[2] The Company's auditor testified that Delafield closed "as near" as can be determined from the Company records "about August 1, 1932." This indicates that Fitch's thefts could not have begun until some time in 1930, rather than, as alleged, in 1928. Jenkins was then asked if he followed "a similar procedure" at the No. 2 plant. His answer was: "Yes, sir, clear on up until we went to making out this daily report." Asked again as to when "that" first started at Delafield, he replied: "It started in 1930."

But again asked when Fitch first told him to "make these deductions in the ice production record" at Delafield, Jenkins said: "It was right after Mr. Courser left, I think, Mr. Courser left in 1927, didn't he, or '28 * * * well, I just can't remember, it's been so long * * * I'll say it was along in 1928." Other testimony indi-

---

2 Unless otherwise indicated by the context, the quotations in this part of the opinion are from Jenkins.

cates, though not as clearly as desirable, that Courser, whom Fitch succeeded as General Manager, did not leave until after Delafield was shut down in August, 1932. On cross, Jenkins gave 1928 or 1929 as the year in which Fitch first told him to under-report the month's production of ice. These latter statements are the only justifications, though most tenuous ones, for claiming thefts in 1928 and 1929.

During the second period the ice produced on each day was stated in a comprehensive sales and production report daily made out and sent to the office . On every day of that period, says Jenkins, he placed from $54 to $30 in currency in a specially made box in the safe at No. 2 plant, from which Fitch would periodically withdraw it. To prevent detection, he would, he said, report as the day's ice production a number of tons which would be the true production less one ton for each $6 placed in the box.

Jenkins had great difficulty in fixing the date on which the second, or box, period began and the first, or reduction in monthly production, period ended. The monthly reductions continued at No. 2, says he, "clear on up until we went to making out the daily report." He was told to make that out "the first time Mr. Bordelon and Mr. Neate came to the plant * * * I would say, I believe, as near as I can remember it was in '35." "They wanted to get that ice plant money under some kind of control so that somebody could handle it besides . Mr. Roland. That's the statement Mr. Bordelon made."[3] The genesis of the daily report was, however, not the belief that it was required to protect the ice revenues from Fitch, but Neate's opinion that it was "desirable from the audit standpoint" and "from the operative standpoint, because at that time mechanical refrigeration was making great inroads into the ice business, and it was only a question of time" before something would have to be "done to save it * * * better records would have to be available for such survey work." But Jenkins did not then make out the daily reports for, so he said, Fitch told him not to. Fitch, said Jenkins, "fought it off for a year," but next summer Bordelon came right

---

[3] Neate was auditor of the Company from 1923 to 1937. Bordelon was one of his assistants.

back and said the thing had gone far enough * * * that they was going to have some kind of reports * * *." Fitch then "finally agreed to let them go on and be made out."

This, of course, fixes the end of the first period and the start of the second as some time in the "summer" of 1936. Since the last daily report which Jenkins made out was that of September 2, 1936, the second period would be limited to several months at the most.

On cross, however, the confusion as to the extent of the second period was cleared up. After resisting repeated attempts to pin him to one starting date for the second period, Jenkins finally said: "Well, to make you a definite answer on that I would have to see the records on it * * * the records that was supposed to go to the plant that had that ice on them." Asked to call for these records, he replied: "I can get it easier than that * * * get the date we started making out those slips." The auditor, so the reporter states, then "left the room" and returned "with some papers." Jenkins, having identified them as the "records" from which he could fix the start of the second, or box, period, asked: "Being as I was mistaken in the year, would you take all that '35 to '36 out of there?" That request was, of course, denied. The entire box period now shrivels down to six days, for these "records" were "six sheets, headed 'Daily Sales Reports,' beginning August 28, 1936, and ending September 2, 1936." Jenkins then said that he began to take the $54 on "That first day there, that date * * * the 26th ain't it?" He accepted a correction that the first day was the 28th. The mountain had, indeed, given birth to a mouse.

Realization that a box period of only 6 days would contradict, and hence destroy, most of his direct testimony soon led Jenkins to a determined but futile attempt to expand that period into something of more consequence by pushing its end forward into 1937. But we must doubt the very existence of periods which so obligingly expand and contract.

Page after page of testimony describe the daily destruction of the retained portions of tickets made out for ice which was paid for at the plant. This is intended, of course, to produce the belief that Fitch could not

have escaped detection had those tickets been permitted to go into the daily money bag. Indeed, Jenkins said: "If the cash tickets had been put in the sack and took to the office like the charge tickets, they could have run those cash tickets up and accounted for every damn penny." But a "run" of the cash tickets, had the bag contained them, would neither have accounted for "every damn penny" nor exactly shown the day's production of ice. As a preliminary to the daily preparation of the money bag, the pounds of ice on hand at the beginning of the day were added to those made during the day. The pounds called for by the day's tickets were then subtracted from the resulting total. The difference, had a ticket been made out for all ice disposed of during the day, should, of course, have tallied with the pounds of ice on hand at the end of the day. But no tickets were made out for retail ice, or for free ice, or for ice sent to the uptown office. Thus, the ice on hand at the end of the day would be short by the number of pounds so disposed of, and both the cash register and the bag would contain currency—that derived from ice sold at retail—for which there would be no ticket or other supporting voucher. Thus to have checked tickets against cash and currency would not neessarily have led to Fitch's detection, but only to the irrelevant fact that 100 pounds of ice had been sold at retail for each 40 cents in excess of the total amount called for by the cash tickets.

On cross, Jenkins, after stating that the cash tickets were daily destroyed by Fitch, was asked when "Fitch started it." He answered: "He started it the first time me and him ever checked up together, when I first went to the plant * * * the 20th of March, in 1926 * * * He showed me how to check up * * * and the credit tickets was there and he put them in the money sack, and the other tickets he tore them up and throwed them in the waste basket and told one of the negroes to take them out and burn them up." But even Jenkins does not claim that Fitch's pilferings began before 1928. The daily destruction of ice tickets, which began at least two years before those alleged pilferings was, therefore, not initiated to conceal them. While, of course, Fitch may have taken advantage of this fortuitously pre-existing practice in order to conceal his thefts, if he committed

them, the testimony convinces us that the cash tickets were daily destroyed because they had served their purpose, if indeed they had any, when the money bag had been prepared at the plant, and that the uptown office would not have checked them against the currency and checks contained in the bag had they been put in it.

Thus the conclusion, drawn by the Company, that the daily destruction of cash tickets indicates Fitch's guilt cannot be accepted, despite Jenkins' confession that his "conscience told me there was something wrong * * * when those cash tickets was tore up." As tickets were "tore up" long before he claims that Fitch's thefts started, that conscience must have had a certain clairvoyant quality.

Jenkins' descriptions of the preparation of the daily money bag and its transportation to the office contains many improbabilities. Fitch, said Jenkins, always carried the money bag to the office until Jenkins began daily to put the money in the safe for him. Fitch's need for opportunities to take the money himself thereupon ceasing, he, so Jenkins states, told him, "You can carry the money now up to the office." The testimony of the other witnesses, however, convinces us that possession of the bag by Fitch under such circumstances that he could dip into it with impunity was the exception rather than the rule.

On September 3, 1936, another employee was sent to the plant to supplant Jenkins in making up the daily and other required reports. However, we are not convinced, as Jenkins would have it believed, that his removal was because of connivance in Fitch's thefts and is, therefore, corroborative of their occurrence.

The evidence, laying aside the discredited $54 a day tale, is, with two exceptions, entirely circumstantial and, therefore, damaging to Fitch only by way of inference. It consists of: The fact that no cash tickets went into the money bag, which might have indicated, but most probably did not, that ice money was being taken; the fact that, on occasion, Fitch carried the bag to the office, which indicates nothing more than that he had opportunities to take ice moneys, had he been so minded— though, since Colonel Jones very frequently rode with him and the bag—most of them were poor ones; the

fact that Jenkins was supplanted as preparer of the daily reports, which, however, does not require the belief that this was done to protect the ice revenues from Fitch; the fact that, if certain employees at the plant— still employed by the Company when they testified—are to be believed, they were instructed by Jenkins—not Fitch—to falsify their original ice production records by deducting the familiar 9 or 5 tons per day, which, of course, is just as consistent with Jenkins being the culprit, if there was one, as it is with Fitch's; and the fact that Jenkins and others claim that Fitch, presumably to put the maximum amount of ice and cold storage receipts into lootable form, ordered the plant employees to refuse all checks. But the order which Fitch says he gave was not so sweeping—being merely not to take a check unless certain that it was good. That this was the actual order seems clear from the large number of checks filed as exhibits and the testimony of some peddlers and of 11 out of 18 cold-storage customers that they had paid by check at the plant. We are also unable to find any sinister significance either in the testimony of those who stated that their checks were refused, or in the statement of a Company employee that currency would generally predominate in Fitch's bank deposits which he made for him during the "last few months of 1936." Manifestly, the circumstantial evidence just summarized is entirely insufficient to establish Fitch's guilt.

The direct testimony that Fitch took ice moneys, such as it is, will now be considered. On direct examination, Jenkins did not make any claim that he actually saw Fitch take any money. It was not until directly challenged on cross-examination that he said: "I have seen Roland Fitch * * * take a roll of those bills and stick them in his pockets * * * I have seen him take rolls of bills, time and again, and put them in his pocket." This is a direct statement. To be sure, its credibility is much impaired by Jenkins' unaccountable omission of those incidents from the list of Fitch's high crimes and misdemeanors which he gave on direct examination. But it establishes Fitch's guilt unless we conclude, as we are forced to do, that here, as seemingly in many other instances, Jenkins' story was but the figment of his hyperactive imagination, over-stimulated by animosity to

Fitch and an innate love for the sensational. The only other direct evidence that Fitch took any ice moneys is that given by an employee at the No. 2 plant who said that he saw Fitch pocket a $20 bill from the ice money on the table in the plant office. Analysis of this testimony shows that it is entitled to little, or no, weight. On cross-examination the witness was unable to say whether or not Fitch replaced the $20 bill with smaller bills.

There is no direct evidence whatsoever that Fitch ever pocketed, much less even handled, any currency reeived at the plant as rental for cold storage space. There is no testimony, unless it be the opinion of a platform man that this currency went into the money bag, which suggests any theory as to how cold storage revenues could have been diverted into Fitch's pockets. All agree that Colonel Jones rented out the cold storage space, collected the rents, whether paid in cash or by check, and recorded them correctly in a ledger which he kept in his desk in the office at the No. 2 plant. There is no suggestion whatsoever, either in the pleadings or in the testimony, that any reports of cold storage transactions which the plant may have made to the office were falsified, or that Colonel Jones would, much less did, connive in any theft of cold storage rentals. Thus, only if cold storage currency went into the bag, does the evidence show that Fitch had even the opportunity to take it. The only testimony which might suggest that Fitch was pocketing cold storage currency is that of a plant employee, who said that, acting on Fitch's instructions, he burned the cold storage ledger in the latter part of September, 1936. Consideration, however, of that testimony convinces us that the burning of the ledger, if indeed it occurred, falls far short of establishing that any cold storage currency was taken by Fitch.

"The record," as the Company's brief correctly states, "is replete with proof that the years 1930-1936 marked a decline in the natural ice business due to electric refrigeration." The ice sales shown by the Company's books for the critical years do not, when considered against that background, leave room for the belief that any appreciable amount of currency paid in for ice failed either to be recorded on the books or deposited to the Company's credit in bank.

The total cash sales, the total credit sales, the total of all sales, and the profit or loss for the critical years, as shown by the Company books, reflect this steady decline. They show a high for all sales of $71,413 in 1929 and a low of $23,035 in 1941. The profits of each year decline correspondingly and almost uninterruptedly, as does the profit percentage. Further, the books disclose that the sales for 1937, the year following the cessation of Fitch's alleged thefts, only exceeded by $5.514 those for 1936, and that the declining profits became losses by 1939.

The petition alleged that "during the entire period from May 1, 1928, to September 3, 1936, Fitch appropriated to his own use" $133,200 of the "cash receipts" from the sale of ice at plant No. 2 by "regularly" deducting from the "cash receipts turned over to" the Company "$54 a day * * during seven months of each year and $30 per day * * * during five months of each year." When Jenkins' testimony disclosed that $54 could have been taken only on 5 or 6 days, a re-appraisal by the Company of its claim for ice moneys[4] in the light of the total failure of that testimony to live up to expectations and to support the quoted allegations, might have been in order. In any event, it now became necessary for the Company to search elsewhere for evidence that its books did not reflect all the currency which had been paid for ice. It did so. The basis of the belief that its books were not accurate appeared when Foley, a Company auditor since 1940, and its last witness, was asked on cross how he tested them. He replied: "I reviewed the records and, based on the S. E. C. testimony and conferences with various ice dealers and ex-employees and employees, attempted to determine whether or not the records stated all the facts * * *. From my investigation, the records apparently do not state all the facts." Asked how he reached that conclusion, he said: "From the testimony in the record at the present time * * * as compared with the information shown on the books of the company." He was then asked: "In other words you accepted the memory of witnesses who had testified in this case as against the original contemporaneous records of the Company?" He answered:

4 The genesis of which testimony given by Jenkins and others before the Securities and Exchange Commission Examiners.

"That's right." Of course, with equal, if not better, reason he could as well have accepted those records to cast doubt on that testimony.

If the employees who testified before the "S. E. C." —possibly because they wished to make the most of their brief opportunity to bask in the limelight of a local sensation—were as willing as Jenkins to exaggerate, their testimony would justify interviewing customers as to their purchases in order to test the books. But, of course, no set of books will show sales over a period of years even approximately equal to the collective recollections of a number of customers. Such a test may thus produce a spurious shortage in revenues obtained by any company from customers, who have no records and who may not be able to refrain from magnifying the importance of their businesses by exaggerating their purchases.

Nevertheless, the Company had all available peddlers and cold storage customers describe their purchases of ice and rental of cold storage space during each of the critical years.

From their testimony the Company's auditor then estimated their respective total dollar purchases of ice and rentals of cold storage space for each of those years. The total "cash" ice sales and the total rentals shown by the books for each year were then subtracted from the auditor's corresponding figure for that year. The resultant difference, the Company insists, is the amount which Fitch took in the particular year. The grand total of his claimed thefts is obtained by adding these differences.

That process necessarily required fixing the purchases of each witness for each year during which he bought. Had any peddler been able to establish by his records, or even been willing to state without qualification, the price he paid and the entire quantity which he bought in the given year, a mere reading of his testimony would have supplied the figures to be multiplied to obtain the dollar figure for the year. But not one peddler did so. Only eight of the 23 had any records of their purchases in the critical years. All testified either in 1940 or 1941. Thus practically every figure which entered into the auditor's dollar total for each

year was, to some degree, based on the witnesses' memory of events taking place from four to 12 years before. As those events were routine and monotonously similar business transactions, and thus not apt to leave much of an impression on the memory, it is not surprising to find that few customers gave either the price paid, or the quantity of ice or space bought, or the years in which bought, without qualification or, for that matter, without frankly admitting that the figure, quantity, or year was but a guess.

And where the peddler, as did many, gave his purchases by the day, the week, or the month, instead of by the year, the accuracy of the auditor's figure for the year would depend not only on the accuracy of the peddler's memory, but also upon how correctly the auditor had interpreted the testimony in order to obtain the total quantity for the year. For example, the statement of a peddler, and several so stated, that he averaged so many blocks a day between such and such dates had to be construed to determine whether it meant purchases of that quantity on each and every day or only on those days on which he bought—and the record shows that, at least, two peddlers did not buy on Sundays—before the auditor could obtain the number of days to be multiplied by the indicated daily quantity.

And when, as was almost always the case, the peddler qualified the dates on which his purchases for a stated year began and ended with the word "about," the auditor had to decide whether, under a fair construction of the testimony, he could start counting days from, say, May 1st, when the witness had said "about" May 1st.

And when the peddler, as was the case with several, was not even able to fix the year in which he started or quit buying, the auditor had again to interpret testimony, in order to decide which of the several alternate years was most likely to have been the true one.

Some peddlers estimated what they bought in the ice season. As they bought during several ice seasons, and as the total sales of one season necessarily vary from those of others—for no summers have identical temperatures or durations—the auditor, before he could, as he did, use the same quantity for each season, had to

conclude that the witness possessed both the memory and mathematical skill required to add mentally the purchases for each season into one quantity and to divide it by the number of seasons to obtain an average. In drawing these various inferences and making these decisions as to the weight and the fair meaning of the testimony, the auditor was not acting as an expert accountant or mathematician, but was usurping a function of the court.

As the Company says, an audit by an expert accountant of books and records—though but his opinion as to the ultimate facts disclosed by their detailed entries—is, under certain circumstances, nevertheless competent. But, despite its authorship, the auditor's report is not such an audit. To be sure, it is captioned, "Report on the Examination of Books and Records * * *." But, manifestly, the principal thing examined was the testimony of the customers, and the purpose of that examination was, not to assist the trier of the facts by refining the original entries of the books and other records into ultimate facts, but to discredit those very books and records by that testimony. In other words, having given, as a qualified expert, the competent opinion that the day by day entries on the books indicated total "cash" sales of so much for each year, he then interpreted and weighed a mass of testimony—although no more qualified or entitled to do so than any other lay witness—to form an incompetent opinion by which to attack the competent opinion which he first gave. To accept his conclusions, as the Company insists we must, would, therefore, be but to add the partisan employee of a party to the judicial hierarchy trying this case, and to convert what was but a sworn argument for the Company into a finding of fact not lightly to be disturbed upon appeal.

Given the ice bought by a peddler during several months, the quantity he is apt to have purchased during the other months of the season or year can be reconstructed with a fair degree of accuracy for, over the years, the ice demand for each month will bear a fairly constant ratio to that for each other month. The Company says that its books from September 1, 1936, on are accurate. Twenty-three peddlers testified. Eight of them had records which showed some purchases be-

fore September 1, 1936. Twelve bought after September 1, 1936. Yet the post-September 1, 1936, purchases of six of those 12 peddlers were not used. The Company had in its possession "probably thousands" of customers' tickets. Though these would have afforded a check on the testimony of certain peddlers or a basis for reconstructing their purchases, they, too, were not used "for one reason or another." This failure to use these records—clearly far better evidence of, or clues to, the peddler's purchases than his memory—is unexplained. The opinion even of an expert, which admits ignoring much of the best evidence available, is, for that reason alone, entitled to no weight.

As said supra, all ice paid for at the plant—whether paid for in currency or by check—was recorded on the books as "cash" sales. Certain peddlers, whose purchases the auditor estimated, frequently paid by check. Thus both the minuends and the subtrahends which the auditor subtracted to establish his claimed shortages were composite figures and reflected conjectured or actual sales paid for in two mediums, one of which was not stealable. The total of the resulting remainders, $147,976.09, therefore, was but another composite figure and would reflect—even if the cash sales for the critical period had been actually $305,040.59 (the auditor's figure)—not the currency pocketed by Fitch but the sales made at the plant which should have been, but were not, recorded on the books as "cash" sales. Thus, had the $305,040.59 figure been both competent and accurate, the report would, at best, merely indicate the existence of a shortage without establishing any amount.

Subtracting book sales of a certain commodity from estimated sales of it will only prove a shortage if both the minuend and subtrahend are accurate. Thus, if some receipts from the sale of the particular commodity, though actually deposited in the seller's bank account, are not recorded as such because mingled with other types of receipts, a seeming, but non-existent, shortage to the extent of these mislabeled receipts will result from the subtraction process employed by the auditor. The testimony does not convince us that all cold storage rentals received by the Company were recorded as such. Thus not only the minuend but also

the subtrahend which the auditor used in forming his opinion that Fitch pilfered $10,357 of cold storage rentals must be rejected.

We must conclude that the court erred in entering judgment against Fitch for more than $17,500. The case is reversed on the appeal and on the cross-appeal, with instructions to enter a judgment in conformity with this opinion.

Reversed.

A. J. Bratcher and John Marshall, Jr., Special Judges, sitting for Judge Sims and Judge Dawson.