THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEBORAH WILHOITE, Defendant-Appellant.

First District (5th Division)   No. 1—89—1577

Opinion filed December 27, 1991.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Jeanette Sublett, and Donald Lyman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a trial without a jury, defendant Deborah Wilhoite was found guilty of the attempted murder of her nine-year-old daughter. The court sentenced her to a term of 10 years in prison. On appeal, defendant contends that she proved by a preponderance of the evidence that she was insane at the time of the offense and that the State failed to prove specific intent beyond a reasonable doubt.

At trial, the State presented all of its evidence by way of stipulation. The parties agreed that if defendant's nine-year-old daughter, Tiffany Wilhoite, were called to testify, she would state that on February 28, 1988, at 9:00 p.m. she, her 11-year-old sister Ava and her 14-month-old brother Andy were in their respective beds. Tiffany saw defendant pick Andy up, walk towards the window of the eighth-floor apartment, and open the window. Defendant was saying, "We have been saved and are going to heaven." Ava managed to pull Andy away from defendant, run into the bathroom and lock the door.

Defendant then grabbed Tiffany and pushed her out of the window head first. Tiffany resisted, saying, "Mama, I thought you loved me." Defendant pushed Tiffany's entire body out of the window, but Tiffany held on to a curtain and did not fall. Defendant then walked away from the window. A neighbor then came and pulled Tiffany up into the apartment, unharmed. Her mother was gone.

The parties agreed that if Ava were called to testify she would testify similarly.

The parties agreed that if Valerie Brown were called to testify, she would state that she lived in a ninth-floor apartment in defendant's building. On February 28, 1988, at 9:00 p.m., she heard screaming. She looked out her window and saw Tiffany being pushed out of a window by defendant. Defendant was yelling "Get out."

If Stanley Norman were called to testify, he would state that he lived on the sixth floor of defendant's building. On the night in question, he heard screaming and saw Tiffany hanging out the window by a curtain. "He would testify that he ran up to the [defendant's] apartment ***. And as he got to the door to their apartment he encountered the defendant whom he would identify in open court who was fleeing the apartment." Norman entered the apartment and helped Tiffany back into the apartment. They located Ava and Andy hiding in the bathroom.

If Officer Skahill were called to testify, she would state that she arrested defendant on March 1, 1988, at 6 p.m. in an apartment at 1900 West Washington. Skahill and an assistant State's Attorney in-

terviewed defendant at the police station. Defendant told them that on February 28, 1988, she smoked a marijuana cigarette, then began to pray. "The defendant told her that she thought throwing Tiffany out of the window was a test to see if the defendant could get into heaven. The defendant thought she would be able to join Tiffany in heaven. She took Tiffany over to the window [and] Tiffany said, 'Mama, I thought you loved me.' The defendant stated, 'I do love you.' And then she pushed Tiffany out the window. The defendant thought she had \*\*\* succeeded in throwing Tiffany out of the window to her death." A laceration on defendant's head was the result of the struggle with Tiffany.

The State then rested its case.

The defense then presented the stipulated testimony of three psychiatrists who had each previously examined defendant on behalf of the court.

If Dr. Gerson Kaplan, a forensic psychiatrist employed by the Psychiatric Institute, were called to testify, he would state that he examined defendant on June 6, 1988. (On March 31, 1988, the court ordered the Psychiatric Institute to examine defendant as to her mental condition and report to the court.) Based on his examination and his review of the police reports, Dr. Kaplan would opine that at the time of the offense defendant was legally insane and unable to conform her behavior to the requirements of the law due to the condition of brief reactive psychosis.

If Dr. Albert Stipes, a forensic psychiatrist employed by the Psychiatric Institute, were called to testify, he would state that he examined defendant on July 14, 1988. (On June 17, 1988, the court ordered the Psychiatric Institute to examine defendant as to her mental condition, including her fitness to stand trial and her sanity.) Based on that examination, Dr. Stipes would opine that defendant was legally insane at the time of the offense.

If Dr. Robert Reifman, a forensic psychiatrist employed as director of the Psychiatric Institute, were called to testify, he would state that on November 2, 1988, he examined defendant. (On October 17, 1988, the court ordered Dr. Reifman to examine defendant as to her mental condition and report to the court.) Based upon that examination, he would opine that defendant was legally insane at the time of the offense. She suffered a brief psychotic reaction which rendered her unable to appreciate the criminality of her act or conform her conduct to the requirements of the law.

Defendant then rested her case.

In rebuttal, the State called Dr. Werner Tutuer, a psychiatrist, to testify in court. (On August 23, 1988, the court granted the State's motion for a third opinion "from outside of the Psychiatric Institute.") Dr. Tutuer testified that he examined defendant on October 9, 1988. He had also reviewed the reports of Drs. Kaplan, Stipes and Reifman. He opined that she was legally sane at the time of the offense. She was able to conform her behavior to the requirements of the law. In addition, she was able to form intent. "[S]he had knowledge when she escaped after the incident." Dr. Tutuer believed defendant was "under the influence of pot when this incident happened." He was of the opinion that she "was in a drugged condition." He diagnosed the condition of cannabis intoxication.

Dr. Tutuer testified that during his interview with defendant, she provided him with a background history which revealed that Ava was born when defendant was 15 years old. Tiffany was born two years later. When defendant was 21 years old, she moved out of her parents' home with the two girls, and moved in with her boyfriend, who fathered her third child, Andy. In 1987, Tiffany informed defendant that the boyfriend had molested her. The boyfriend then moved out.

According to Dr. Tutuer, defendant disclosed to him that for 10 years she had been using marijuana and "restrict[ed] [her]self to two intakes twice a week." She reported no history of mental illness.

Defendant reported to Dr. Tutuer that on February 28, 1988, she smoked marijuana 15 minutes before the incident in question. Defendant reported that after she smoked the marijuana, she felt like "the world was coming to an end. And then she became confused. She has complete amnesia for the incident." (Similarly, his written report states: "She had smoked one joint of pot approximately 15 minutes before the incident and stated that she felt the world was coming to an end. Now follows a period of confusion and there is complete amnesia regarding the window incident.") Defendant also stated that Tiffany resisted and eventually was able to get back in through the window. Dr. Tutuer did not recall defendant saying anything about the intervention of a neighbor.

In his testimony, Dr. Tutuer conceded that defendant did not tell him how much marijuana she had smoked on February 28, 1988. He believed that patients "have never given [him] relevant information in this context." Defendant reported using marijuana twice a week and therefore was an "addict." Dr. Tutuer also conceded that according to defendant, she had never before reacted to marijuana in a similar way.

Dr. Tutuer testified further that he did not believe defendant had suffered from brief reactive psychosis because she had no history of mental disease and the minimum period for brief reactive psychosis was two days and defendant's reaction did not last that long.

Dr. Tutuer believed that defendant's flight from the scene was "not relative to the brief reactive psychosis" diagnosis because the two were inconsistent.

> "Q. Doctor, with regard to brief reactive psychosis, would you find it significant in your diagnosis that the defendant was able to stop her actions and attempt to escape after the intervention of a neighbor? Is that significant in your diagnosis?
>
> A. In my diagnosis of drugged condition.
>
> Q. Should I say would this be significant if a person was to make a diagnosis of brief reactive psychosis?
>
> * * *
>
> That defendant attempted to escape after a neighbor intervened?
>
> A. Yes."

In surrebuttal, defendant called Dr. Reifman to testify. Dr. Reifman testified that on November 1, 1988, he examined defendant. He had also reviewed previous examinations done at the Psychiatric Institute by Dr. Baker, a psychiatrist; Dr. Stipes; Dr. Kaplan; Dr. Fautek, a psychologist; a social worker who interviewed defendant's mother; and a letter concerning defendant from an organization called Causes. Dr. Baker's psychiatric interviews took place on March 8, 1988, within a period of time when the brief reactive psychosis could be even more easily determined. He also reviewed the police reports. The police reports were consistent with defendant's report of the incident to Dr. Reifman.

Dr. Reifman opined that defendant was legally insane at the time of the incident. She suffered from brief reactive psychosis which resulted in her being unable to appreciate the criminality of her act or to conform her conduct to the requirements of the law. At the time, she was aware that the act was a violation of the law. Even if a police officer had been standing next to her, she still would have committed the acts in question. The precipitating factors of the psychosis were two stresses: discovering "around that time * * * that her live-in boyfriend had been molesting her daughter, which was a severe stress to her; and secondly, she was having financial difficulty." These stresses could account for "this breaking point." Smoking marijuana was not the cause of the psychosis.

The brief reactive psychosis ceased within less than two weeks, "but there were indications that she was still religiously preoccupied for several months" while in jail.

Dr. Reifman further testified that the ingestion of marijuana was not an organic factor precipitating the psychosis here. The typical symptoms of cannabis intoxication, as listed in the standard diagnostic manual used in the mental health field, included anxiety, suspiciousness, paranoid ideation, impaired judgment, and panic attacks. However, according to Dr. Reifman, these were also symptoms "found throughout the [diagnostic] book. They are symptoms that go along with psychosis. There are symptoms that go along with practically every major psychiatric disturbance." He also took into account that defendant had no previous psychiatric history.

Defendant reported to Dr. Reifman that on February 28, 1988, "God communicated to her that the end of the world was about to occur and that she should, she and her children should die painfully so that they would have peace in heaven." She then threw Tiffany out of the window. She believed she was doing an "altruistic deed; she was saving her children from a horrible death when the world came to an end and giving them a painful death now, but then they would have peace in heaven, so it seemed to her with her mental condition at that time that that was a logical, reasonable thing to do."

Dr. Reifman stated that he was aware that a neighbor gained entry to the apartment, and that defendant then "fled." He explained:

"[I]t means to me that there was some awareness of reality at that given time, some awareness that something had gone wrong.

\* \* \*

\*\*\* Well, she describes it like having a seizure, so I think there was at some level awareness that something was going on that was terrible."

During the incident, defendant was "very guarded. I mean, she ha[d] an illusion that the world was coming to an end. I think that she would be suspicious of anything that would happen at that time. I think she was very vulnerable to suspiciousness at that time. She was also hearing voices at the time. I think she heard God's voice telling her this, so her, in her state of confusion I would say emotionally she was very suspicious."

Dr. Reifman further testified that defendant informed him that she had smoked a joint or two of marijuana every week for 5 or 10 years, but he did not consider her an "addict." Although he agreed

that a person experiencing cannabis intoxication may experience auditory hallucinations, he explained further:

> "It's not a natural ordinary response, it could be an idiosyncratic response, it would be a[ ] rare response.
>
> I took that into consideration, but it's unlikely, very unlikely this would happen to a person who had used marijuana over a period of time, because apparently this is the first time it ever happened.
>
> When you experience, when a person experienced these kinds of strange reactions to substance, that usually is early when they start taking them, early in the game.
>
> A person who has experienced marijuana over years is unlikely to have an untoward reaction to it after experiencing the drug for about five or ten years, whatever time.
>
> It's those people who have never experienced the drug that have a strange reaction to it."

Thus, if defendant were going to have a reaction to marijuana, "it would have happened when she first started using the drug." Defendant had never experienced "this kind of difficulty" with marijuana.

At the time of the November 1, 1988, examination, defendant exhibited signs of depression, but she was free of psychosis.

The court found that defendant was legally sane at the time of the offense and was guilty of attempted murder. It rejected the defense psychiatrists' opinions because defendant had no prior history of mental illness and they had "no explanation for it." The court found Dr. Tutuer's diagnosis of cannabis intoxication, "a voluntary cannabis intoxication caused by the frequency of the defendant's use," to be "more logical." The court concluded that the cannabis intoxication "did not deprive her of any capability of forming an intent nor did it deprive her of a capability to conform her conduct to the requirements of the law."

OPINION

Defendant contends she proved by a preponderance of the evidence that she was not sane at the time of the offense.

■ A defendant may not be convicted of conduct "if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(a).) Defendant bears the burden of proving "by a preponderance of the evidence that the defendant is not guilty by reason of insanity." (Ill. Rev. Stat. 1987, ch. 38, par. 6—

2(e).) A preponderance of the evidence means defendant must prove it is "more likely than not that he was insane when he committed the offenses charged." (*People v. Moore* (1986), 147 Ill. App. 3d 881, 886, 489 N.E.2d 701. See also P. Robinson, 1 Criminal Law Defenses, §5(c), at 51-52 (1984) ("Proof by a preponderance of the evidence requires the burdened party to convince the jury that the claim he asserts is more likely than not to be true. Where a defendant must prove a defense by a preponderance of the evidence, the factfinder must deny the defense where it believes only that it is *as likely as not* that the defendant qualifies for the defense").) (Emphasis added.) The State bears no burden on the issue of insanity. *People v. Seuffer* (1991), 144 Ill. 2d 482.

Under the pre-1984 insanity defense, a reviewing court would only overturn the finding of the trial court on sanity if the finding was so improbable or unsatisfactory as to create a reasonable doubt as to defendant's sanity. (*People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 415 (construing Ill. Rev. Stat. 1979, ch. 38, par. 6—2).) Because the burden of proof has been modified from "beyond a reasonable doubt" to "a preponderance of the evidence," the standard of review has changed to "a determination of whether the trial court's finding was against the manifest weight of the evidence." (*People v. Quay* (1988), 175 Ill. App. 3d 965, 968-69, 530 N.E.2d 644.) For other opinions construing the new insanity defense and holding that the standard of review is that the fact finder's resolution of the sanity issue will not be disturbed unless it is contrary to the manifest weight of the evidence, see, e.g., *People v. Johnson* (filed November 27, 1991; as revised upon denial of rehearing February 3, 1992), 146 Ill. 2d 109, 128-29, 585 N.E.2d 78; *People v. Beehn* (1990), 205 Ill. App. 3d 533, 539, 563 N.E.2d 1207; *People v. Engram* (1990), 193 Ill. App. 3d 511, 523, 549 N.E.2d 1333; *People v. Janecek* (1989), 185 Ill. App. 3d 89, 93, 540 N.E.2d 1139; *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 33, 535 N.E.2d 1001; and *People v. Martin* (1988), 166 Ill. App. 3d 428, 433, 519 N.E.2d 1085. See also *People v. Bradley* (1991), 220 Ill. App. 3d 890, 904 ("it was not unreasonable for the jury to conclude that defendant failed to prove the defense of insanity by a preponderance of the evidence"). Cf. *People v. Beehn*, 205 Ill. App. 3d at 541-42 (Steigmann, J., specially concurring) (standard of review should be same as civil standard for directed verdict or judgment *n.o.v.*).

The issue of defendant's sanity at the time of the offense is generally a question of fact. (*People v. Martin*, 166 Ill. App. 3d 428, 519 N.E.2d 1085.) The weight to be given an expert's opinion on sanity is measured by the reasons given for the conclusion and the factual de-

tails supporting it. (*People v. Martinez* (1980), 86 Ill. App. 3d 486, 408 N.E.2d 358; *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388.) The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court. (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289.) The trier of fact may accept one expert's testimony over that of another, but the witness must be credible in his diagnosis. *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 524 N.E.2d 1112; *People v. Palmer* (1985), 139 Ill. App. 3d 966, 487 N.E.2d 1154.

If the expert's opinion is without proper foundation, particularly where he fails to take into consideration an essential factor, that opinion "is of no weight, and must be disregarded." 32 C.J.S. *Evidence* §569(1), at 609 (1964), ("[e]xpert testimony is of no weight, and must be disregarded, when it is contrary to common sense * * *, undisputed facts * * *, or where the opinion admits ignoring much of the best evidence available"), citing, *e.g.*, *Kentucky-Tennessee Light & Power Co. v. Fitch* (1946), 304 Ky. 574, 201 S.W.2d 702; see also 32 C.J.S. *Evidence* §569(2), at 616 n.38 (1964), citing *Marshall v. Sellers* (1947), 188 Md. 508, 53 A.2d 5 (if any essential facts have been overlooked, the weight of the expert's opinion is thereby weakened or destroyed).

In *People v. Parr* (1971), 133 Ill. App. 2d 82, 86-87, 272 N.E.2d 712, the court found that the testimony of the State's expert witness was "improperly admitted into evidence, in light of the fact that no proper foundation was laid for its admission" where the expert admittedly failed to take into consideration the weight of the occupants of the vehicles "which [was] especially significant in light of his testimony that his opinion as to the speeds of the vehicles was based in part on the relative weights of the vehicles." See also *Heideman v. Kelsey* (1960), 19 Ill. 2d 258, 265-66, 166 N.E.2d 596 (expert's testimony was "at best meaningless" and was not competent evidence and was improperly admitted where he "failed to take into account" essential information regarding handwriting specimens).

■ In the present case, the State's expert witness, Dr. Tutuer, diagnosed defendant's condition as cannabis intoxication. That diagnosis suffers from many foundational flaws which fatally undermine his opinion that defendant was legally sane at the time of the offense.

Dr. Tutuer never asked defendant nor otherwise attempted to ascertain how much marijuana she smoked on the night of the incident, or at any previous time. While Dr. Tutuer stated that patients generally have poor credibility regarding the amount of marijuana ingested,

he also stated that the amount ingested would be a variable relevant to a diagnosis of cannabis intoxication.

The State argues in its brief that "Dr. Tutuer did not admit the amount of cannabis smoked would be significant to a finding of cannabis intoxication." However, the record shows that Dr. Tutuer was asked on cross-examination about whether his opinion varies depending on whether the patient smoked five cigarettes or half a cigarette of marijuana. He testified as follows:

"A. *It might*, but my experience is that defendant and patients have never given me relevant information in this context.

Q. So, you don't concern yourself with the amount that is ingested—.

\* \* \*

A. *Not particularly*, because there is usually very poor credibility with regard to the amount taken." (Emphasis added.)

Because Dr. Tutuer failed to ascertain or even consider the amount of marijuana ingested by the defendant, his opinion attributing defendant's conduct to cannabis intoxication rather than to brief reactive psychosis is untenable. (See *People v. Jackson* (1991), 144 Ill. 2d 43, 69, 72, 88-89 (failure to establish amount of marijuana and cocaine ingested renders expert opinion that defendant was intoxicated too tenuous in absence of strong support from other symptoms).) Without the knowledge of the amount ingested, Dr. Tutuer's diagnosis depends entirely upon the inferences to be drawn from defendant's behavioral symptoms. The evidence shows that the textbook source Dr. Tutuer professes to use as guidance in diagnosing her condition virtually negates his conclusion and supports those of defendant's experts. As we detail below, the trial court's conclusion that there was "no explanation" for a diagnosis of brief reactive psychosis ignores the substantial evidence offered by the defense.

The diagnosis of cannabis intoxication is listed in the Diagnostic and Statistical Manual of Mental Disorders, at 139 (3d ed. rev. 1987) (DSM-III-R). The State argues that we cannot consider the DSM-III-R because it was not admitted as substantive evidence and is not part of the record. However, the parties and witnesses at trial all referred to and relied upon the DSM-III-R extensively. All four psychiatrists, including Dr. Tutuer, acknowledge the use of the DSM-III-R in formulating their diagnoses. Many of the criteria listed in the DSM-III-R relating to the diagnoses of cannibas intoxication and brief reactive psychosis were discussed in detail in the testimony of Dr. Tutuer and

the testimony of Dr. Reifman. The State itself used the manual in its cross-examination of Dr. Reifman.

Moreover, we may consider scholarly authority referred to by the parties in interpreting the evidence. (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753.) The DSM-III-R is a diagnostic manual drafted by the American Psychiatric Association for the purpose of detailing diagnostic classifications used in the mental health field. (*People v. Lang* (1986), 113 Ill. 2d 407, 498 N.E.2d 1105; *People v. Lucas* (1986), 140 Ill. App. 3d 1, 487 N.E.2d 1212 (DSM-III-R is a recognized treatise in the fields of psychology and psychiatry); *People v. Parker* (1983), 113 Ill. App. 3d 321, 447 N.E.2d 457 (DSM-III-R is standard text for diagnosing psychiatric illness); *In re Marquardt* (1981), 100 Ill. App. 3d 741, 427 N.E.2d 411 (DSM-III-R's purpose is to outline diagnostic categories and achieve a uniform nomenclature in psychiatry to facilitate statistic gathering and information exchange).) We also note that the State itself argues in its brief that Dr. Tutuer's diagnosis of cannabis intoxication "was supported by the evidence and by DSM-III-R."

Under the diagnosis of cannabis intoxication, the DSM-III-R states that symptoms such as abnormal feelings of anxiety and panic attacks occur "primarily in people who have not developed tolerance to the substance." (DSM-III-R at 139.) In rejecting a diagnosis of cannabis intoxication, Dr. Reifman relied on the fact that defendant had used marijuana consistently for 10 years. She had never suffered an adverse reaction in the past. Dr. Tutuer offered no explanation for the anomaly that one night's use of marijuana, after a decade of smoking marijuana regularly, would cause defendant to throw her children out of an eighth-floor window. In contrast to Dr. Tutuer, yet consistent with the DSM-III-R upon which Dr. Tutuer relied, Dr. Reifman opined that it would be "rare" and "highly unlikely" to experience such a reaction after having developed a tolerance to the drug.

Moreover, defendant's symptoms went far beyond mere anxiety and discontent, and actually extended into hallucinatory delusions. It is undisputed that defendant suffered from auditory hallucinations and delusions. These symptoms were even acknowledged by Dr. Tutuer. Defendant believed the world was coming to an end and that God had commanded her to kill her children so that they could find peace in heaven.

The DSM-III-R expressly states that "[t]ransient hallucinations or delusions are common" symptoms of brief reactive psychosis. (DSM-III-R at 205.) Significantly, however, the DSM-III-R does not include auditory hallucinations or delusions within the diagnostic criteria of

cannabis intoxication. In fact, it states that hallucinations caused by cannabis intoxication are *rare* except where very high blood levels are reached. (DSM-III-R at 139.) It would be ironic to presume high blood levels here, where Dr. Tutuer did not ascertain any amount at all, and the other evidence in the record indicates defendant smoked only a single "joint."

This is not a case where defendant may have invented the "voice of God" hallucinations as a defense *after* the offense occurred. Here, Tiffany testified that when her mother brought Andy to the window she stated, "We have been saved and we are going to Heaven." Moreover, defendant consistently reported to the arresting officer and every physician who examined her that she was reacting to religious delusions. See *People v. Garcia* (1987), 156 Ill. App. 3d 417, 509 N.E.2d 600 (reversing conviction and finding defendant was insane where he heard spirits communicating with him and was unable to ignore the voices commanding him to harm the victim).

Similarly, the DSM-III-R attributes the symptom of aggressive behavior to brief reactive psychosis. (DSM-III-R at 205.) Defendant's aggressive behavior toward her children falls under this description.

The DSM-III-R also states that brief reactive psychosis appears shortly after and in response to events which are markedly stressful, conditions which both defendant's and the State's experts recognized as having been present at the time of the occurrence. (DSM-III-R at 205.) Dr. Reifman noted the highly stressful events of the molestation of Tiffany by defendant's live-in boyfriend and Andy's father, who then moved out of the apartment, and the recent financial difficulties experienced by defendant. (Dr. Tutuer's report specified various financial problems including a cancellation of defendant's public aid for herself and her three children; her landlord's threat to evict defendant if she did not pay past-due rent; and the electric company's decision to turn off defendant's electricity.)

In addition, Dr. Tutuer rejected the diagnosis of brief reactive psychosis on the erroneous basis that the condition must last at least two days, and upon the additional erroneous basis that defendant's symptoms lasted only a short time. On the contrary, the DSM-III-R states that the condition may only last a few hours. (DSM-III-R at 205.) It should be noted with respect to Dr. Tutuer's expressed contention that it has to last over two days that nothing in this record supports his presumption that defendant's symptoms dissipated before that time. In fact, Dr. Reifman opined that, in defendant's case, the condition actually persisted for up to two weeks.

Dr. Tutuer also believed the diagnosis was incorrect because defendant had no prior psychiatric history. However, the DSM-III-R does not require a prior psychiatric history for a diagnosis of brief reactive psychosis.

We further note that the DSM-III-R requires at least two of the following symptoms for cannabis intoxication: conjunctival injection; increased appetite; dry mouth; or tachycardia. (DSM-III-R at 140.) There was no evidence that defendant exhibited any of these symptoms. Moreover, the DSM-III-R diagnosis of cannabis intoxication requires that the behavior not be due to any physical or other mental disorder. (DSM-III-R at 140.) Even Dr. Tutuer found that defendant suffered from a personality disease.

Thus, the weight of Dr. Tutuer's opinion is substantially diluted by its pervasive inconsistency with the DSM-III-R. See *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 134, 336 N.E.2d 338 (opinion of plaintiff's expert was "thoroughly discredited" where court's examination of exhibits he relied upon "force[d] the conclusion that the only reasonable explanation for the tire's failure was the one offered by the defendants"); see also *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.*, 12 Ill. App. 3d at 179 (opinion of plaintiff's expert was "severely impeached by the physical exhibits" before the court).

Thus, we are not convinced by the State's assertion at oral argument before this court that cannabis intoxication can be inferred from defendant's symptoms, even though the quantity ingested is unknown. (See *People v. Jackson* (1991), 144 Ill. 2d 43 (defendant failed to raise the affirmative defense of voluntary intoxication from marijuana and cocaine where defense experts did not know amount of drug ingested by defendant and where his behavior at the time of the murders, the detail of his recall, his motor coordination and lack of difficulty in speaking, walking or maneuvering all indicated he was not intoxicated or drugged to the point of being incapable of acting knowingly or intentionally).) Based upon the DSM-III-R, defendant's symptoms cannot be attributed to cannabis intoxication without gross distortion and rash speculation and therefore may not provide a basis from which an inferential diagnosis of cannabis intoxication can be made. See *People v. Janecek*, 185 Ill. App. 3d at 94 (court reversed conviction, finding that trial court's rejection of expert witness' conclusions that defendant was insane was against the manifest weight of the evidence where both State and defense expert witnesses agreed on the factual evidence showing that defendant was confused, incoherent and suffering from delusions and hallucinations at time that defendant believed

she was in danger, heard voices, believed her car wanted her to drive to a certain location, and led police on 24-mile high-speed chase).

Although Dr. Tutuer and the trial court purported to place some weight on the stipulated fact of defendant's flight, the record discloses that the stipulation merely states that Norman, defendant's neighbor, would testify that when he entered the apartment, "as he got to the door *** he encountered the defendant *** fleeing the apartment." They also stipulated, however, that Tiffany would testify that her mother "walked" away after pushing Tiffany out of the window.

The stipulated testimony is not inconsistent with the diagnosis of brief reactive psychosis. Dr. Reifman explained that defendant's leaving the apartment indicated she was aware at some level that "something was going on that was terrible." In addition, she was extremely guarded and suspicious of her environment because at the time she was hearing God's voice telling her that the world was ending. Flight "for the purpose of evading punishment under the lash of a guilty conscience" (*People v. Martin* (1942), 380 Ill. 328, 340, 44 N.E.2d 49) differs significantly from, *e.g.*, flight which is part of defendant's insane delusion. Dr. Reifman found no indication that defendant was fleeing in order to escape detection.

It should be noted that although Dr. Tutuer indicated that defendant's "flight" was significant to his diagnosis, he relied upon inferences that were not mandated by the stipulated testimony of Norman through which the flight factor was established.

The question posed to Dr. Tutuer (whether it was significant that "defendant was able to stop her actions and attempt to escape after the intervention of a neighbor") erroneously presumed flight in the face of detection and apprehension. The actual stipulation simply presumed flight of a general, unfocused nature. There was no testimony that defendant fled *after* she saw Norman, but rather defendant was in the process of "fleeing" as Norman entered the apartment. Nothing in the stipulated testimony of Norman indicated that defendant "stopped" her actions, upon perceiving Norman's presence. The testimony of Tiffany indicates quite clearly that defendant did not stop until she believed that she was successful in carrying out her mission, after which she "walked" to the door.

Moreover, the testimony of Dr. Tutuer, including his testimony pertaining to the "flight" factor, would not provide a basis to preclude defendant from proving by a preponderance of the evidence that she lacked the "substantial capacity to *** conform [her] conduct to the requirements of law," and therefore was insane at the time of the

offense (Ill. Rev. Stat. 1989, ch. 38, par. 6—2(a)), nor does the State purport to make any such argument.

The key here is whether defendant "lack[ed] substantial capacity *** to conform [her] conduct to the requirements of law" (Ill. Rev. Stat. 1989, ch. 38, par. 6—2(a)), not whether she had knowledge of the criminal nature of her conduct. See *People v. Schmidt* (1915), 216 N.Y. 324, 338-40, 110 N.E. 945, 949-50 (Cardozo, J.) ("A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong."). See also *People v. Skinner* (1985), 39 Cal. 3d 765, 217 Cal. Rptr. 685, 704 P.2d 752 (defendant not guilty by reason of insanity where he believed the homicide was commanded by God); *State v. Cameron* (1983), 100 Wash. 2d 520, 674 P.2d 650 (defendant may be insane where he believed God directed him to kill his stepmother).

■ As further support for the psychiatric testimony offered by defendant, we note that Dr. Reifman relied on outside sources of information which Dr. Tutuer apparently never saw. Dr. Tutuer only reviewed police reports and the reports of Drs. Stipes, Kaplan and Reifman. In contrast, Dr. Reifman had access to those sources plus reports from Drs. Baker and Fautek, a social worker, and the Causes letter. Notably, the report of Dr. Baker which Dr. Reifman reviewed was made within a week of the incident. Dr. Reifman testified that this was the most opportune time to examine defendant and determine if she suffered from brief reactive psychosis. See *People v. Arndt* (1980), 86 Ill. App. 3d 744, 749-50, 408 N.E.2d 757 (reversing conviction on basis of insanity; relying on defense psychiatrist who examined defendant less than two days after the occurrence and thus "was in an excellent position to evaluate her condition").

■ Based on the foregoing considerations, Dr. Tutuer's opinion regarding defendant's sanity "raised serious doubts as to the validity of [his] conclusion and thus was entitled to 'little if any' weight." See *People v. Palmer*, 139 Ill. App. 3d at 973 (reversing conviction on basis that defendant was insane, and finding State's psychiatric testimony was weak and self-contradictory); *People v. Marshall* (1983), 114 Ill. App. 3d 217, 448 N.E.2d 969.

The trial court's conclusion that it was "more logical" that defendant's behavior was the result of intoxication caused by frequency of use is a medical diagnosis made by the trial judge alone. It ignores the fact that Dr. Tutuer did not base his opinion on *frequency*

of use. Instead, he focused on the single episode of cannabis intoxication. Moreover, this argument is diametrically contradicted by the fact that there were no prior episodes.

Furthermore, "it does not seem that the [trial] court questioned the credibility of the psychiatrists, but rather that it drew different conclusions than they did." *People v. Arndt*, 86 Ill. App. 3d at 749 (reversing defendant's conviction and remanding for entry of a finding of not guilty by reason of insanity); see also *People v. Garcia*, 156 Ill. App. 3d at 424 (same).

We conclude that the manifest weight of the evidence at trial established that it was more likely than not that defendant was insane at the time of the offense. The weak and conflicting reasons offered by Dr. Tutuer for his opinion that defendant was sane and the absence of factual details supporting that opinion render the opinion of little or no weight, as a matter of law. The trial court's holding that defendant failed to prove by a preponderance of the evidence that she was insane at the time of the offense is against the manifest weight of the evidence. See *People v. Janecek* (1989), 185 Ill. App. 3d 89, 540 N.E.2d 1139; *People v. Garcia* (1987), 156 Ill. App. 3d 417, 509 N.E.2d 600; *People v. Arndt* (1980), 86 Ill. App. 3d 744, 408 N.E.2d 757.

In view of our holding, we need not address defendant's contention that the State failed to prove beyond a reasonable doubt that she had the requisite specific intent for attempted murder.

For the foregoing reasons, the judgment of the circuit court of Cook County finding defendant guilty of attempted murder is reversed, and the cause is remanded with directions that the court enter a finding of not guilty by reason of insanity and for further proceedings pursuant to section 5—2—4 of Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—2—4).

Reversed and remanded with directions.

MURRAY and McNULTY, JJ., concur.