THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAY HAMMERLI, Defendant-Appellant.

First District (3rd Division)   No. 1—93—3567

Opinion filed January 31, 1996.

Michael J. Pelletier and Barbara C. Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Marcelle M. LeCompte, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a bench trial, defendant, Raymond Hammerli, was found guilty but mentally ill of first-degree murder in violation of section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a) (now 720 ILCS 5/9—1(a) (West 1994))) and was sentenced to a term of 35 years' imprisonment for that crime. It is from the judgment of conviction that defendant now appeals to this court pursuant to section 6 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

This case involves defendant's strangulation of his former wife on Valentine's Day 1990, in their home at 801 South Emerson in Mount Prospect, Illinois.

Defendant earned a bachelor's degree in civil engineering in 1980 from the University of Illinois at Urbana-Champaign. While in Champaign he met Diane Bothrom (hereinafter Diane), whom he married in 1983. In 1988, defendant earned his master's degree from the University of Chicago, after having worked as a project manager at Quaker Oats Company. Diane and defendant began seeing a therapist in an attempt to save their marriage but eventually they separated in May 1989. Their divorce was final on January 30, 1990.

On February 1, 1990, defendant tried to purchase a shotgun. The following day he instructed his broker to sell all his Amoco stock for over $31,000. Several days later defendant picked up some eyeglasses he had ordered in October 1989, and purchased a sleeping bag, toothpaste, razor blades, shampoo, shaving cream, briefs and socks. He also tried to buy another shotgun. The next day defendant closed out a money market account held jointly by him and Diane in the amount of $640.84. During this period of time defendant also prepared his income tax returns.

On February 10, 1990, defendant withdrew all the money from his and his former wife's IRA accounts, which amounted to over $13,000 including a penalty. On February 12, 1990, defendant cashed a $15,000 personal check from a joint account he kept with Diane. None of the tellers involved in these transactions stated that defendant behaved in an unusual way.

According to defendant's account of events, he placed a hammer and knife in the house on South Emerson on February 13, 1990. Diane was moving away with her new boyfriend, and defendant told his doctors that she was slipping away from him and that he had wanted to kill her on February 13, but controlled his behavior.

Defendant changed a 1 p.m. appointment he had regarding the sale of the South Emerson house, stating that he had other plans for the day and signed all the documents at 11 a.m. The secretary who explained the documents to defendant said that he was attentive and calm as he completed them. She observed nothing unusual in his behavior.

Diane called her mother the morning of February 14, 1990, to tell her that she was meeting defendant at their former marital residence because defendant had asked to borrow Diane's Isuzu Trooper vehicle to move out some of his belongings. A neighbor across the street watched as they loaded the Isuzu. At 1:45 p.m. snow was accumulating inside the Isuzu. At 3 p.m., the door to the Isuzu was closed and defendant's Toyota was gone.

Diane's parents drove to the house on South Emerson when they could not locate their daughter. Diane, who had been strangled, was found in the bathroom; her feet were bound at the ankles by a belt, her head was in a pool of blood and she displayed bruises and scrapes. Her blood was found on the front door and screen and her bloodied jacket was hanging on a nearby bookshelf. A lens from defendant's glasses was on the bathroom floor.

According to defendant's account, he struck Diane's head with a hammer because he hated seeing all those things from his life with Diane being packed into boxes. He subdued Diane several times as

she attempted to run out the front door; he told her to remove her coat and asked her to write a check for half the value of the Isuzu. He also explained to her that he was taking all their money and that he would let her go if she gave him an hour to flee.

After Diane ran into the bathroom, he let her hold the hammer while he tied her legs together. She struggled with him and knocked his glasses off and said "I want my mommy." Defendant then strangled Diane until the telephone rang, which startled him. He fled in his Toyota after closing the door of the Isuzu.

The following day, defendant's Toyota broke down in Oklahoma. Defendant arranged to have it towed to a dealer in Amarillo, Texas, because the car was still under warranty. Defendant used the name Bill Hauli on the towing bill but signed his real name at the bottom. The Oklahoma mechanic described defendant as "normal."

The service manager of the dealership offered to provide defendant with a "goodwill" rental car because nothing about defendant seemed abnormal. The mechanic, who explained the needed repairs, stated that defendant seemed annoyed but otherwise like someone who was on vacation.

Defendant then drove back to Mount Prospect but did not enter his mother's house when he saw cars outside. He then drove to Champaign, Illinois, where he stayed at a motel using an alias. He called the Texas dealership on February 23, 1990, the day his rental agreement expired, and explained that he would return the car in a week. When he did not, the situation was reported to the local sheriff's department. Telephone records finally placed defendant at the motel in Champaign where he was arrested with razor marks on his wrists. On the way to the police station defendant signed a statement saying that he had "killed Diane Hammerly [sic] on Feb. 14, 1990 afternoon." Defendant also told police which medications he needed.

The search of defendant's Toyota revealed a Watchman television and adaptor, a sleeping bag and tent, a windsuit and other clothing, an air-powered rifle, a BB gun and binoculars. The search of the motel room and rented car revealed $57,000 in cash, financial documents, a birth certificate, checkbook, two airline tickets and defendant's State and Federal income tax forms. Defendant's checkbook was balanced through December 27, 1989.

At the police station, defendant memorized the security key pad combination and escaped. After he was apprehended, he wanted to know if he was going to be charged with escape. After his indictment, defendant was referred to the Psychiatric Institute for an evaluation, was found unfit to stand trial and was remanded to Chester Mental Health Center (hereinafter CMHC) for treatment.

The trial court was advised in June 1990 that defendant could be restored to fitness within a year at CMHC. Defendant's treatment plan was prepared by a number of physicians and other staff personnel and stated that defendant's consciousness was unimpaired during his interview, his intellectual level was high and his fund of information was "above average." Defendant was clean and neat in appearance, there was no suggestion of homicidal or suicidal thoughts and no evidence of hallucinations. Defendant's predominant mood was one of mild depression, which the staff found "consistent with [his] thought content." Defendant was guarded and cooperative during the interview and denied feeling depressed although he looked "withdrawn." He requested psychological testing.

In July 1990, an evaluation was submitted to the circuit court which again found defendant's appearance to be clean and neat. The submitting psychiatrist found no signs of formal thought disorder, and defendant was deemed to be self-centered and manipulative. Defendant told the doctors that he was depressed and had suicidal thoughts but had no plans to execute them. Defendant denied having hallucinations and was oriented in time and place. His concentration and memory were fair. Defendant did not want to talk about the killing but believed he could help his lawyer in his own defense. At this time he was still found unfit to stand trial.

Another evaluation was submitted to the circuit court in October 1990. Defendant was found to be fully oriented, had no suicidal or homicidal thoughts or any other psychotic symptoms and was not depressed. Defendant still refused to talk about the crime because it made him "anxious and agitated." His treatment now consisted solely of lithium medication.

In May 1991 defendant was found fit to stand trial "with medication."

Four experts testified on defendant's behalf that he was suffering from a mental illness and insane at the time he killed Diane. Their testimony included a review of defendant's hospitalization prior to the killing, police reports, and statements of defendant and his family. Each of them referred to the DSM-III-R diagnosis book, which contained diagnostic criteria for mental illnesses. Defendant's father had been hospitalized in the 1970's for manic-depressive psychosis, and defendant's siblings testified that they noticed in defendant symptoms similar to those exhibited by their father prior to his hospitalization, including poor daily hygiene and pacing.

Two of defendant's co-workers testified that his demeanor changed in the summer of 1989 when his attendance at work became erratic and he seemed withdrawn and preoccupied. While a spectator

at the Western Open golf tournament in July 1989, defendant was preoccupied with Diane and their divorce, called his answering machine every 15 minutes and finally left early. By defendant's own account he became angry when he heard about Diane's new boyfriend.

At his sister's insistence defendant went to Dr. Charmin, an internist, in October 1989. Dr. Charmin noted that defendant was under a great deal of stress, losing weight, having trouble sleeping and depressed. Dr. Charmin prescribed Xanax to help him sleep and recommended that defendant see a psychiatrist. Defendant's primary diagnosis was depression.

Later in October 1989, defendant walked home from downtown after leaving his work in the middle of the day. He told his sister that he believed that the police thought he had a bomb in his gym bag and were following him in helicopters. His sisters convinced him to admit himself to a hospital where he stayed for two to three weeks. Defendant was diagnosed as suffering from a major depressive disorder, single episode, with psychotic features, hearing voices and experiencing delusions. He was on short-term disability from his work from October 24, 1989, and lived with his mother until the day of the killing.

Defendant's siblings described several incidents that occurred to defendant during the period from October 1989 through January 1990. These included defendant's having anxiety attacks, hyperventilating, placing a string around his nephew's neck, and hearing nonexistent conversations. However, none of defendant's siblings heard him express homicidal or suicidal thoughts. They also noticed how much better defendant seemed in early February 1990; he cut his doctor visits to once per week and was planning to return to work and get his own apartment. Defendant told one of his doctors that he would be too scared to commit suicide.

The personnel representative at defendant's employer, who kept in contact with defendant about his disability leave, testified that when she spoke to him before 10 a.m. on February 14, 1990, defendant was a lot less attentive than usual. She felt that either defendant was seriously ill or was pretending to be sick.

Dr. Robert Reifman, the director of the Psychiatric Institute, examined defendant on March 19, 1990, and found him unfit because he was too depressed to assist counsel. Dr. Reifman examined defendant twice in the fall and determined that defendant had been suffering from a schizo-affective disorder at the time of the crime and was unable to conform his conduct to the requirements of the law. Defendant had described the details surrounding the crime in detail.

According to Dr. Reifman, defendant had a serious thinking disorder, was obsessional to pathological in providing details and had delusions and hallucinations. He believed that Diane was divorcing him in order to destroy him. In early February 1990, defendant became delusional when he heard what he thought was a "special message." Defendant believed that a radio news broadcast regarding a man who had murdered his mother with a hammer in Waukegan was meant for him since Diane came from Waukegan. This delusion was not told to anyone until 1991, although several doctors examined defendant in 1990.

Dr. Reifman also described defendant as schizoid, emotionally distant and having difficulty expressing any kinds of feelings. Defendant, who was unable to tolerate separation and abandonment, believed that he could relieve his pain by destroying his ex-wife. Dr. Reifman testified that defendant's withdrawal of money and purchases were not inconsistent with his mental disease because his plans were illogical and defendant had no plan for escape. For example, defendant's purchase of camping equipment was illogical because he already had such equipment and he never used what he bought. The doctor described several other instances of defendant's illogical thinking.

Dr. Reifman did not believe that defendant was malingering because he told the same story to all the doctors. Defendant had a psychological lift when he decided to kill his wife after his previous suicidal impulses. Nor did Dr. Reifman believe that defendant's treatment prior to the murder contributed to his mental illness because the drugs prescribed did not cause defendant's illness. In Dr. Reifman's opinion, defendant could appreciate the criminality of his acts during early February 1990, but was legally insane at the time of the crime.

Dr. Henry Conroe, a forensic psychiatrist, examined defendant on April 16, 1990, and several other times and found him to be of superior intelligence. In his opinion defendant suffered from manic-depression, a bipolar disorder, and was legally insane at the time of the crime. Dr. Conroe described the criteria for this disease and noted defendant's genetic predisposition to severe mood disorder. According to Dr. Conroe, defendant's mixture of phases reached a crescendo in October 1989 when he walked home from downtown believing that police were following him.

In Dr. Conroe's opinion, prescribing anti-depressant drugs to a manic-depressive could cause a swing to a manic state. Defendant told the doctor that he thought about killing his mother and tried to strangle her in early February 1990. In the doctor's opinion defen-

dant was sane at this time. Defendant's dosage of Prozac had just been doubled, but defendant was not responding.

Defendant also told Dr. Conroe that his moods were shifting very rapidly by February 14, 1990. He tried to fight off hurting Diane but was unable. After the killing, defendant continued to have suicidal thoughts and told police that he wanted the death penalty before he was charged with a crime. When he escaped from the police station, he hoped he would get hit by a car. According to the doctor, it was not unusual that defendant would remember details that he had previously blocked out. Dr. Conroe described defendant's behavior as consistent with someone who had a psychiatric illness, not someone who was simply angry with losing his wife. He also found no evidence of malingering.

Dr. Conroe's review of notes concerning defendant while at CMHC indicated that defendant sat quietly during his thrice-weekly psychotherapy sessions and became "self-absorbed reading the DSM-III-R diagnosis book." Another therapist from CMHC wrote that defendant had become preoccupied with his defense. In Dr. Conroe's opinion, defendant was legally sane the day before the murder when he was thinking about killing Diane, placing weapons in the house and withdrawing money but was not sane at the time of the crime.

Dr. Edward Blumstein, the chief psychologist with the Psychiatric Institute, also examined defendant on March 29, 1990. He found defendant unfit to stand trial because he was extremely depressed and preoccupied, had memory impairment, was suicidal, suffered from insomnia, was confused and expressed feelings of hopelessness. He believed defendant suffered from a major depressive disorder but was unaware of defendant's past history at the time.

The doctor described the difference between major and minor depressive symptoms and did not believe defendant was malingering because it was not possible to fake symptoms of depression or schizophrenia over a prolonged period of time.

When Dr. Blumstein examined defendant in May 1991, he found him in partial remission. He spent eight hours with defendant in September 1991 and diagnosed him with a schizo-affective disorder, bipolar type, and a mixed personality disorder with compulsive and paranoid features. Based on this disease defendant lacked the capacity to conform his conduct to the requirements of the law on February 14, 1990.

According to Dr. Blumstein, defendant's goal-directed behavior before the murder was not premeditation since it was based on psychosis. Defendant could still have contact with reality and appear normal and be suffering from a mental disease. In Dr. Blumstein's opinion defendant was not malingering.

Dr. Eliezer Schwartz, a licensed clinical psychologist, was called to testify regarding defendant's diagnosis and the drugs prescribed to defendant prior to the murder. He did not interview defendant, but reviewed defendant's medical history. He testified that defendant was suffering from a thought disorder with psychotic manifestations at the time of the crime. He found defendant to be manic-depressive, a bipolar illness with agitation, impulsivity and the inability to control behavior and thought.

Dr. Schwartz believed that the medication prescribed to defendant had exacerbated his symptoms and intensified defendant's already existing manic and agitated state. According to this witness, defendant's doctors were powerful authority figures, and defendant interpreted one of their statements as a direct command to kill Diane. Radio broadcasts from February 4 and 19, 1990, of the Waukegan murder were played in court.

In rebuttal, the State presented the testimony of Dr. Henry Lahmeyer, whose specialty was neuropsychology and forensic psychiatry. As a result of his examination of defendant, in March 1992, and his review of defendant's medical history, he concluded that defendant had symptoms of depression but was not suffering from a major psychiatric disorder that would have impaired his judgment on the day he murdered Diane. According to Dr. Lahmeyer, defendant's success in his education and his work indicated that he had no mental illness but only difficulty with interpersonal relationships. Once he realized that Diane was leaving him, he actively pursued her, became angry and stalked her. The doctor explained that defendant's belief that police were following him was an idea of reference, not a delusion. Defendant's psychosis lasted only a day and then cleared.

Dr. Lahmeyer pointed to notes of defendant's physicians who were treating him prior to the murder and recalled that defendant had expressed some suicidal thoughts, but that defendant had improved in the last two weeks before he murdered Diane. The doctor also stated that homicidal ideation was rare within psychiatric illnesses and that defendant's obtaining information from the radio broadcasts about the Waukegan murder was not delusional thinking.

Further, the doctor stated that defendant's complex planning would have been impossible for a psychotic person. In addition, defendant filled out detailed real estate papers the morning of the murder. When the killing occurred, he pulled Diane away from the door, gave Diane the hammer to calm her and explained to her that he wanted to tie her up so that he could get away. When she struck him in the eye, he reacted in rage, strangled her and fled when he heard the telephone ring. The doctor noted that defendant took the time to close the door to the Isuzu.

Dr. Lahmeyer also detailed defendant's escape plans, including his use of an alias. While in Champaign defendant ate regularly, exercised, went to basketball games, watched students, and only encountered some sleeplessness when he stopped taking his medication. Defendant quickly perceived his situation when arrested and was able to memorize the keypad number and flee. According to the doctor, these were not the actions of a psychotic person.

Dr. Lahmeyer found no suicidal behavior following the murder and discounted defendant's cutting himself with razor blades as ineffective. In the doctor's opinion, defendant's suicide attempts while at CMHC were attempts to get transfers away from gangs. The staff described defendant's involvement in activities as normal.

Dr. Lahmeyer found no evidence that any of the medicine given defendant exacerbated his condition and some evidence that it helped. Defendant remembered the details of the murder and aftermath and placed psychological meaning on his actions.

The trial judge found that defendant had not established that he was insane at the time of the crime by a preponderance of the evidence and found him guilty of first-degree murder but mentally ill. In rendering its decision the trial court stated that defendant had acted methodically and logically in planning the murder, his escape and coverup. Defendant's actions were not those of one who was unable to conform his acts to the requirements of the law. The trial court specifically found that defendant did not fall into a deep depression until he was finally legally insane, but acted in a cowardly and selfish way by showing that he was unwilling to allow Diane to have her own life. Defendant was sentenced to 35 years' imprisonment for the murder of Diane.

## ISSUE PRESENTED FOR REVIEW

On appeal, defendant contends that the trial court erred in finding that he did not prove by a preponderance of the evidence that he was insane at the time he killed his former wife and, therefore, his conviction should be reversed.

## OPINION

■ Pursuant to section 6—2 of the Criminal Code of 1961, a defendant may not be convicted if "at the time of such conduct, as a result of mental disease or mental defect, he lack[ed] substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Ill. Rev. Stat. 1989, ch. 38, par. 6—2(a) (now 720 ILCS 5/6—2(a) (West 1994)).) Defendant bears the burden of proving by a preponderance of the evidence that he was not guilty by reason of insanity. (Ill. Rev. Stat.

1989, ch. 38, par. 6—2(e) (now 720 ILCS 5/6—2(e) (West 1994)).) Preponderance of the evidence means that defendant must prove that it was more likely than not that he was insane when he committed the murder. (See *People v. Moore* (1986), 147 Ill. App. 3d 881, 886, 498 N.E.2d 701.) Whether a defendant was sane at the time of a crime is generally a question of fact (*People v. Martin* (1988), 166 Ill. App. 3d 428, 433, 519 N.E.2d 1085), and the trial court, as trier of fact, may accept the testimony of one expert over that of another as long as the accepted opinion is based on a credible diagnosis. (*People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 100, 524 N.E.2d 1112.) On review this court must determine whether the trial court's finding was against the manifest weight of the evidence. *People v. Wilhoite* (1991), 228 Ill. App. 3d 12, 20, 592 N.E.2d 48.

Here, none of the experts who testified had interviewed or treated defendant before the crime, although two of the defense experts had interviewed defendant for his fitness to stand trial a month after the murder. The first sanity determination was not made until June 1990.

Defendant's treating psychiatrist prior to the murder diagnosed him with depression. He also saw defendant the day before the murder and wrote that defendant was improving. He told defendant to put his relationship with Diane "to rest." In the weeks just prior to the murder, defendant's other physician also believed he was better. By contrast, the four defense experts all found defendant to be legally insane at the time of the murder and were able with hindsight to fit defendant's actions into their various diagnoses.

Dr. Blumstein, who interviewed defendant in March 1990, did not diagnose defendant with schizo-affective disorder until after defendant had been at CMHC for a year. According to Dr. Conroe, defendant murdered Diane in a fit of manic rage but was sane the day before the murder and when he thought to strangle his mother. In Dr. Schwartz's opinion, defendant's manic depression had not completely manifested itself at the time of the crime, but his condition was exacerbated by the drugs he was given. Dr. Blumstein rejected the theory that the drugs defendant was taking affected his mental illness. Each found in defendant's behavior facts to support his own opinion. Only Dr. Lahmeyer found that defendant's actions were not consistent with one suffering from a major psychiatric disorder at the time of the murder.

■ The trial court, which did not specifically embrace or reject any of the expert testimony, clearly found defendant mentally ill but able to conform his conduct to the requirements of the law at the time of the crime. This determination was not against the manifest

weight of the evidence given defendant's affect in the days prior to the murder, his planning and purchase of equipment, and withdrawal of funds. Defendant expressed no thoughts of homicide and there was no testimony that defendant's behavior was unusual in any way except that his doctors believed that he was less depressed. The morning of the murder defendant changed his appointment to sign real estate papers and did so with comprehension. In defendant's account of the murder, he planted weapons in the house to use on Diane, lured her to their house on the pretext of borrowing her automobile, struck her in anger, then pulled her away from the door. By his own account, defendant was able to convince Diane that he meant no harm by permitting her to hold the hammer while he tied her feet together. He left the house when the telephone rang and closed the door to Diane's Isuzu. In the next few days defendant negotiated with a dealership for repairs to his automobile and rented a car. He kept in contact with the rental agency while hiding in Champaign. Thus, there is more than enough evidence to support the trial court's determination in this case and, therefore, we find that defendant failed to sustain his burden of proving that he was insane by a preponderance of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI, P.J., and CERDA, J., concur.