2020 IL App (2d) 171015
No. 2-17-1015
Opinion filed August 3, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-CF-2152 |
| | ) | |
| ELZBIETA M. PLACKOWSKA, | ) | Honorable |
| | ) | Robert A. Miller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, the defendant, Elzbieta M. Plackowska, was found guilty of two

counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and two counts of aggravated

cruelty (510 ILCS 70/3.02 (West 2012)).  In so ruling, the trial court rejected the defendant's

insanity defense and found that she had the substantial capacity to appreciate the criminality of her

conduct at the time of the offenses.  See 720 ILCS 5/6-2(a) (West 2012).  On appeal, the defendant

argues that the trial court's determination that she had the substantial capacity to appreciate the

criminality of her conduct at the time of the offenses, was against the manifest weight of the

evidence.  We affirm.

¶ 2                                I. BACKGROUND

¶ 3    On November 15, 2012, the defendant was charged with 10 counts of first-degree murder. The charges alleged that defendant stabbed to death with a knife J.P., her eight-year old son, and O.D., a five-year old girl whom she babysat. The defendant was also charged with two counts of aggravated cruelty for stabbing to death with a knife two dogs, Niki and Tootsie. All of the offenses occurred on the evening of October 30, 2012.

¶ 4    The defendant did not dispute that she committed the charged offenses, but she asserted the affirmative defense of insanity. The defendant waived a jury trial, and the matter proceeded to a bench trial on September 12, 2017.

¶ 5    Marta Dworakowski testified that she was O.D.'s mother. She and O.D. lived in a condominium in Naperville. Dworakowski was a registered nurse. She hired the defendant to pick O.D. up from school and babysit her until 9 p.m., when Dworakowski normally returned home from work. Dworakowski testified that she had never given the defendant permission to take O.D. to church, or to have J.P. and Tootsie, the defendant's dog, inside her condo. On October 30, 2012, Dworakowski arrived home after work and noticed that the defendant's car was not parked outside. She drove to the defendant's house and tried calling the defendant multiple times, but there was no answer. Dworakowski then called the police and they told her to go to the police station, where she was informed that O.D. had been killed inside their condo.

¶ 6    The defendant's son Matt Plackowska testified that he, his parents, J.P., and Tootsie lived in an apartment in Naperville. Artur Plackowska—Matt's father and the defendant's husband—was away from home during the week because he worked as a truck driver. The defendant cleaned houses and babysat. Matt testified that the defendant's behavior started to change after she learned that her father died, in early-to-mid-October. The defendant's father lived and died in Poland. The defendant normally consumed vodka once or twice a week. However,

after her father's death, she started to drink more. She became more stressed out and started sleeping less. She would sleep only a couple hours and then go to work. Aside from these recent changes, she was acting normal until about two or three days before the offenses at issue.

¶ 7    Matt testified that he vaguely remembered a conversation the defendant had with Artur. The defendant said that she saw the devil in J.P. when he was sleeping. After that, she started making J.P. watch religious movies. On the evening of October 29, 2012, while Matt was studying for a test, the defendant kept coming into his room yelling at him. He called a family friend, Macki Moody, who picked him up and brought him to her house. The next day, October 30, he went back home to get a few personal items from the house. The defendant started talking about the devil again while he was packing.

¶ 8    Matt also testified that, about 11 p.m. on October 30, 2012, the defendant came into Moody's house, covered in blood. The defendant said that she had been attacked at O.D.'s house by someone who was dressed all in black. At one point, she stated that the man looked like the devil. The intruder was stabbing the children and then tried to stab the defendant. She said that she was covered in her own blood, but Matt did not see any wounds. She stated that the man had been stalking her and had stated that he wanted to kill her and her whole family. The defendant told Matt that the intruder had taken her cell phone.

¶ 9    Matt called 911 and the dispatcher asked for O.D.'s address. Matt and the defendant walked out to the defendant's car so that Matt could look up O.D.'s address on the car's GPS. When Matt entered the vehicle, he saw a knife covered in blood on the floor by the driver's seat. He looked up O.D.'s address, gave it to the dispatcher, and went back in the house.

¶ 10    Naperville police officer Vincent Clark testified that on October 30, 2012, at approximately 11:24 p.m., he and other officers forced their way into Dworakowski's locked condo. There was

a large pool of blood that led to the master bedroom. Inside the master bedroom, O.D. was found dead on the bed and J.P. was found dead on the floor. There were also two dead dogs on the floor. There was a bloody knife partially in the garbage disposal in the kitchen sink, covered by some dishes.

¶ 11    Dr. Jeffrey Harkey testified that he performed the autopsies on O.D. and J.P.  O.D. was stabbed 94 times and J.P. was stabbed 173 times. They both died from blood loss due to their wounds. Dr. Harkey testified that, either the knife found in the garbage disposal or the knife found in the defendant's car, or both, could have been used to stab the children.

¶ 12    Officer Robert Carlson testified that he was dispatched to Moody's house on October 30, 2012. The defendant was on the floor in the fetal position. When he asked the defendant what happened, she said that she had been at Dworakowski's house and went outside to smoke. When she was outside, a man entered the house. The man had been stalking her. She said that she could not give a description, because it had been dark outside. She said that the blood on her was from the children and that she saw the man stab them. The defendant was transported to Edward Hospital.

¶ 13    The record indicates that the defendant was interviewed by Naperville police officers at the hospital from 12:24 until 1:37 a.m. on October 31, 2012. Detective Richard Arsenault conducted the interview. Detective Wojit Kowal was also present for translation purposes, as he was fluent in Polish, the defendant's native language. The interview was video recorded, and a recording of the interview was played in court. The defendant initially denied killing the children and gave several versions of the evening's events, including that a man attacked and killed the children. However, the defendant eventually admitted that she killed the children.

¶ 14    Arsenault, Carlson, and Kowal interviewed the defendant at the hospital later that morning, from 3:30 until 4:12 a.m.  The interview was video recorded.  The recording was not played in court but was admitted into evidence and reviewed by the trial court.  The defendant said that she took O.D. and J.P. to church on the evening at issue and the priest blessed her, which made her very happy.  After church, they went to O.D.'s house.  The kids were playing in the bedroom when she saw something black that said, "kill the kids."  She told the kids she was going to kill them and told them to pray.  She told J.P. that he had the devil in him.  She stabbed J.P. everywhere to make sure that he was killed "perfect[ly]" so that he would go to heaven.  She told O.D. that she loved her and then stabbed her just like J.P.  She then killed the dogs.  After that, she went back to church and knocked on the door; no one answered so she called and left a message saying that she "killed someone today."  She threw her cell phone out the car window while she drove away.

¶ 15    After the second interview, Kowal stayed with the defendant in the hospital room and she spoke to him in Polish.  Kowal testified that the defendant said that she threw her cell phone out of her car when she was leaving the church, because she thought the police would be tracking her.  She did not get a hotel room, because she knew the police would be looking for her car.  She drove to Moody's house because she planned to kill Matt and Moody.  She said that she would have killed Artur too, if he had been there, because she wanted everyone to die with a "perfect death."

¶ 16    The record indicates that the defendant gave a videotaped statement to Arsenault and Kowal at the police station on October 31, 2012, from 5:43 until 9:12 a.m.  The videotape was entered into evidence but not played in court.  In that interview, the defendant said that she took the children to O.D.'s house after church because she did not want to make a mess in her own house.  The defendant responded affirmatively when asked if she had contemplated committing the murders after church on her way to O.D.'s house.  She then said that she lied and that she did

not know that she was going to kill the kids when she left church. The defendant told Arsenault that, while at O.D.'s house, she heard a voice say, "kill the kids." She also said that, when she turned off the lights for bedtime, she started to feel like "something was happening to [her]." She then went to the kitchen to grab a knife. She told the kids to get on the floor and pray. J.P. told her that something was wrong with him. The defendant told him that he was the devil. She stabbed J.P. first and then O.D. The defendant then killed the dogs. She believed that they would all go to heaven.

¶ 17    When Arsenault told the defendant that she killed the children to get back at everyone, the defendant said that was true. The defendant said that she killed the children because she was not appreciated and was "so, so tired of this life." She whispered "yes" when asked if she killed J.P. to get back at Artur and to make less work for herself. She also said that she did not understand what Arsenault was asking her. Arsenault asked the defendant if she knew that it was "wrong" when she killed the children. The defendant said, "I know" and "yes." She started crying and said that she did not know what happened and that Arsenault was trying to put words in her mouth.

¶ 18    There was testimony from various jail personnel. The defendant was placed on suicide watch in the jail. On October 31, 2012, she was observed pacing, talking to herself, grunting and growling, pretending to cradle a baby, making stabbing motions, and kicking the wall and toilet. On November 5, the defendant said that a child was sleeping on the blanket in her cell and she also acted as if she were pulling clothes out of an imaginary dresser and putting on pants. Jail personnel gave her medicine to calm her down and did not think that the defendant was faking her symptoms.

¶ 19    Dr. James Patrick Corcoran, a contractual psychiatrist for the Du Page County jail, testified as an expert in forensic psychiatry. He met with the defendant 53 times, with the first meeting on October 31, 2012. He believed that the defendant was suffering a psychotic episode when she

arrived in the jail on that date. He opined that the psychotic episode resolved itself between November 24 and December 12, 2012. He diagnosed the defendant with a depressive disorder. He did not believe that she was malingering or embellishing her symptoms. Dr. Corcoran testified that he did not believe that the defendant was suffering from alcohol withdrawal. However, he acknowledged that this conclusion was based on limited information. He was not permitted to contact people outside the jail and inmates often do not give all the necessary information. Additional information such as how often and how much she consumed alcohol could have affected his opinion. He also acknowledged that alcohol withdrawal symptoms could mirror or be similar to psychotic features.

¶ 20   Dr. Phillip Resnick was accepted as an expert in forensic psychiatry and found qualified to render an opinion on the issue of insanity. Dr. Resnick reviewed records, reports, and interviews associated with the case, and he interviewed the defendant on November 12, 2012. Dr. Resnick testified that the defendant told him that on the day of the murders she followed her normal routine, working and picking up the kids from school. She took the children to a church service in the evening and was blessed by a priest. The blessing made her feel very good. Dr. Resnick opined that this is what happens in a bipolar manic episode—someone is too happy, exhilarated beyond the point of just being happy. She then took the kids and the dogs back to O.D.'s house. While the kids were playing, she took Tootsie and Niki, O.D.'s dog, for a walk. When she returned to O.D.'s house, she described seeing a black shadow enter the children. She believed that it was the devil. She then went to the kitchen, took a knife, and killed the children.

¶ 21   Dr. Resnick further inquired about the "black shadow." The defendant said that she felt the shadow lightly touch the back of her head. She said that the children saw the black shadow also and they were scared. She told the children to pray. That is when she went to the kitchen to

get a knife. The defendant described hearing a voice that said, "kill them, kill them." She then stabbed J.P. while he was praying. The defendant described feeling like something took over her body. Dr. Resnick acknowledged that the defendant gave various descriptions of the black shadow and the devil entering the children, and she appeared to have some confusion.

¶ 22 Dr. Resnick further testified that during the interview he asked the defendant whether she thought it was a good or a bad idea to kill the children. She said that, at the time of the killings, she was thinking that she "was not supposed to" but that she "had to" kill the children. At the time of the interview, she said that killing the children did not make sense to her, because she loved the children. Dr. Resnick testified that this showed that her mindset at the time of the interview was very different from what it was during the crime.

¶ 23 Dr. Resnick testified that he read the transcript of the interview at the police station, when the defendant had acquiesced in Arsenault's repeated questioning about committing the crimes because she was angry at Artur. Dr. Resnick opined that Arsenault had repeatedly challenged the defendant's story and had browbeaten the defendant to the point that she acquiesced in the detective's theory of the case.

¶ 24 Dr. Resnick acknowledged that the defendant originally told the story about an intruder killing the children. Dr. Resnick opined that the defendant had consciously lied when she said that an intruder had killed the children. During his interview with the defendant, she said that she did not remember telling anyone about an intruder. Dr. Resnick did not believe that the defendant was trying to misrepresent the truth during the interview. Dr. Resnick believed that the defendant was going through multiple psychotic themes on the night of the crimes and that she was very confused and unable to accurately remember everything.

¶ 25    Dr. Resnick opined that the defendant lacked the substantial capacity to appreciate the criminality of her conduct at the time she stabbed the two children.  He diagnosed her with Bipolar I disorder, manic type with severe psychotic features.  He testified that alcohol or alcohol withdrawal played no role in the case and noted that, when tested at the hospital after the incident, her blood test was negative for blood alcohol.  He opined that the defendant had a psychotic belief that the devil had entered the two children and that, by killing the children, she was killing the devil and allowing the two children to go to heaven.  The defendant believed that God approved of what she was doing.  The fact that the defendant believed that she was acting in the best interests of the children demonstrated that she lacked the substantial capacity to appreciate the criminality of her conduct.

¶ 26    Dr. Resnick acknowledged that the defendant's conduct after the killings, such as throwing her cell phone away and telling the story about an intruder, indicated that she had an understanding that what she did was wrong.  However, he opined that simply because the defendant had some rational thoughts did not mean that she was not psychotic at the time of the killings.  He testified that, when people are psychotic, they can still have some rational thoughts.  He described this as a fluctuating psychosis.

¶ 27    Dr. Resnick opined that the defendant was not malingering, because a person who was not psychotic could not fake sustained manic behavior such as the behavior the defendant exhibited at the jail after the crimes.  Dr. Resnick acknowledged that the defendant had no history of psychiatric illness herself or in her family.  He testified that a person could have a single psychotic episode at some point in life, without being previously diagnosed with a mental illness.

¶ 28    Dr. Resnick testified that he reviewed the report[1] of the State's expert, Dr. Alexander Obolsky. He testified that, in that report, Dr. Obolsky did not offer any basis or reason for his conclusion that the defendant was legally sane at the time of the offenses. Dr. Resnick noted that Dr. Obolsky believed that the defendant had committed the murders because she wanted "to get back at Matt." Dr. Resnick found Dr. Obolsky's conclusion to be unsubstantiated speculation. Dr. Resnick testified that text messages, which were admitted into evidence and he had reviewed, between the defendant and Matt prior to the killings demonstrated that the two had made up and were no longer on bad terms.

¶ 29    Dr. Obolsky testified as an expert in forensic psychiatry and was found qualified to render an opinion on the issue of insanity. He completed an evaluation to determine the defendant's mental state at the time of the crimes. He interviewed her on two occasions: November 17 and December 21, 2012. Before the interviews, he reviewed all available records, including police reports, hospital records, lab reports, videos, and witness statements. He also interviewed Moody, the defendant's sister, the defendant's mother, Artur, and Matt.

¶ 30    Dr. Obolsky opined that, to a reasonable degree of forensic medical psychiatric certainty, the defendant exhibited the medical conditions of severe alcohol use disorder, narcissistic personality disorder, and other specified depressive disorder. Dr. Obolsky agreed with Dr. Corcoran that the defendant was psychotic when in jail after the murders but opined that only some of her hallucinations were real and others were fake. Dr. Obolsky opined that the defendant did

---

[1] While the record on appeal contains references at trial to written reports by Drs. Resnick and Obolsky, those reports are not included in the record.

not lack the substantial capacity to appreciate the criminality of her conduct during the commission of the crimes at issue.

¶ 31    Dr. Obolsky testified that, in conducting his evaluation and interviewing other witnesses, he learned about the defendant's childhood. The defendant was born and raised in Poland. Her father was a pediatrician. She was eight years old when her mother moved to the United States and left her in Poland with her father. She had to grow up and fend for herself at a young age. The defendant met Artur while she was in high school. When she became pregnant, she dropped out of school. She married Artur in July 1992 and Matt was born in October 1992. The defendant said that Artur married her because he knew that the defendant's mother would bring them to the United States. Artur old Dr. Obolsky that they moved to the United States because he had an uncle in New York who was encouraging them to come here. Dr. Obolsky testified that the reason defendant gave was significant because it was an example of the defendant having a "negative attitude of being taken advantage of by other people."

¶ 32    Dr. Obolsky further testified that the defendant stated that it was difficult when they first moved to the United States, because the defendant felt a loss of social status. In Poland, she was the daughter of a physician. In the United States, she was an immigrant cleaning lady. The defendant described her relationship with her mother as "not very good." She felt that she was never good enough for her mother, and her mother was verbally abusive.

¶ 33    Dr. Obolsky also testified that the defendant put a lot of energy into raising her children. She wanted to be a perfect mother with perfect children. Dr. Obolsky testified that the defendant was jealous of her children because they had the perfect mother that she never had. This type of thought process was a common trait of narcissistic personality disorder. The defendant was basically using her children as pawns to boost her own self-esteem. A video clip was played in

which the defendant stated that she did not do anything for years and then, in five minutes, she ruined her life. She was talking about the murders. Dr. Obolsky testified that this concern about herself was characteristic of narcissism.

¶ 34 Dr. Obolsky testified that the defendant was not satisfied with her marriage. She felt that she had made sacrifices, such as forgoing her own education, to raise children. She also felt that Artur was mostly absent. The defendant did not seem to consider that Artur's absence was because he was working to support the family. She did not value that contribution. She essentially felt that she was doing all the work and that Artur was not helping. Dr. Obolsky further testified that the defendant tried to make friends with her employers because she did not like to be viewed as hired help. Although the defendant described Moody as her best friend, the feeling did not seem to be reciprocated.

¶ 35 Dr. Obolsky believed that the defendant put her children on pedestals. In September 2012, Matt was arrested for a marijuana offense. About October 16, 2012, J.P. had given someone the finger at school and said "f*** you" to another child. About October 26, 2012, defendant had to go to J.P.'s school regarding the incident. Both children fell off the defendant's pedestals, as they did not reflect that she was a perfect mother. The children became objects of displeasure and, later, hate. Dr. Obolsky opined that the defendant committed the murders because she felt unappreciated. Her husband did not help her, her children disappointed her, and her mother treated her badly. He opined that the defendant committed the killings as a "vicious birthday gift" for her son Matt.

¶ 36 Dr. Obolsky further testified that there was evidence of and support for the proposition that the defendant understood the criminality of her conduct when she murdered the children. Her statement to the detectives that she killed the children at O.D.'s house because she did not want to

make a mess at her own house showed that she was thinking rationally at the time. In addition, the defendant tried to cover up the murders. She hid a knife in the garbage disposal under some dishes, she threw her cell phone out the car window, and, most importantly, she made up the story about the intruder. Dr. Obolsky testified that he watched the video of Dr. Resnick's interview with the defendant. When Dr. Resnick asked the defendant if she remembered telling the detectives about an intruder, there was a 12-second pause and then the defendant grunted, started breathing faster and deeper, and eventually said that she did not remember. Dr. Obolsky testified that this was an example of malingering or taking control of an interview situation. The question made the defendant anxious and she did not want to talk about it.

¶ 37    Dr. Obolsky acknowledged the defendant's statement that she and the children saw a black shadow. Dr. Obolsky testified that hallucinations were only in one's own mind. If the defendant had been hallucinating the black shadow, she would not have claimed that the children saw it. Although Dr. Resnick stated that this could be just an inaccurate perception, Dr. Obolsky opined that it could also be an intentional misrepresentation. Dr. Obolsky testified that the defendant's descriptions of her visual hallucination were not consistent. She first said it had one head, then two heads, or no head, and the defendant could not describe whether the shadow had fingers or claws. Dr. Obolsky concluded that it was not an authentic hallucination. In addition, generally if someone hears voices, they hear them speaking in their native language. Because the defendant's native language was Polish, Dr. Obolsky believed that her description of hearing the voices speaking in English supported a conclusion that the defendant was malingering. He further opined that, if the defendant experienced hallucinations, she would be able to remember them consistently over time. The defendant would not have memory problems or variation as to "whether there were voices or whether there was a shadow, whether there was a devil, then not remembering it." Dr.

Obolsky opined that the story about the intruder, the shadow, and the devil show that the defendant knew that she did something wrong and that she needed an excuse.

¶ 38    Dr. Obolsky testified that his evaluation revealed that the defendant had an alcohol-use problem for years. In addition, after her father died, the defendant started to drink more, with increased frequency. This resulted in agitation, anger, and family arguments. Dr. Obolsky stated that primary psychiatric conditions should not be diagnosed when someone is abusing any type of substance. Substance abuse could be misdiagnosed, as could any and all psychiatric conditions. Dr. Obolsky opined, nonetheless, that the defendant's alcohol misuse was not the reason she committed the murders.

¶ 39    Dr. Obolsky opined that, if the defendant truly had a psychiatric condition, such as Bipolar I disorder, she would have experienced a recurrent manic episode during the five years she had been in jail before the trial. The Du Page County jail records did not indicate that she had any other manic episodes. Further, she had been off antidepressants for 12 to 18 months and had not had any other mood disorder symptoms. Dr. Obolsky opined that, since the defendant did not have any history of bipolar disorders prior to the crimes at issue, it was more likely that when she was admitted to the county jail she was suffering from alcohol withdrawal or brief reactive psychosis.

¶ 40    Dr. Obolsky acknowledged that, prior to his evaluation, Dr. Resnick had also conducted a forensic psychiatric examination. He believed that Dr. Resnick had failed to follow up in certain areas. He did not believe that Dr. Resnick sufficiently inquired into the defendant's reasons for killing O.D. and the defendant's relationships with Artur, Matt, and others. Dr. Obolsky testified that, even after reviewing Dr. Resnick's conclusion, he still believed that the defendant was sane at the time of the murders and that Dr. Resnick's diagnosis of Bipolar I disorder was improper.

¶ 41    During closing arguments, the State acknowledged that all three doctors agreed that the defendant was psychotic at the time she was admitted to the county jail. The State was not contesting this conclusion but argued that it was not controlling as to the defendant's state of mind at the time of the offenses.

¶ 42    Following closing arguments, the trial court found that the State proved the defendant guilty on all counts. The trial court rejected the defendant's insanity defense. The trial court found that the defendant suffered from a mental illness and that her "psychotic state" could have been caused by the loss of her father, her family's inability to meet her expectations, or a compilation of many factors. The trial court found persuasive Dr. Obolsky's testimony that the defendant was faking some of her psychotic symptoms after the murders. The trial court found that, even if the defendant thought that the devil was in the children, she knew that she was stabbing the children and that it was wrong.

¶ 43    The trial court noted that there are three considerations in measuring a defendant's capacity to appreciate the wrongfulness of her conduct: efforts to avoid detection, disposal of evidence, and efforts to avoid apprehension. The trial court found that the defendant's conduct met all three requirements. The defendant had tried to hide the knife, discarded her phone, and lied about an intruder. The trial court noted that the defendant mentioned the black shadow for the first time to Dr. Resnick and that Dr. Obolsky concluded that the shadow was not an authentic hallucination. The trial court noted Dr. Obolsky's opinion that, if the defendant had been hallucinating, she would not have claimed that the children saw the shadow, and the trial court found significant that there was no command from the shadow to kill the dogs. The trial court also found significant that the defendant did not want to kill the children in her own home because it would have been messy.

¶ 44    The trial court acknowledged that Dr. Resnick criticized Dr. Obolsky for failing to provide any reasoning for his conclusion that the defendant had the substantial capacity to appreciate the criminality of her conduct.  However, the trial court noted that Dr. Resnick "did the same thing." The trial court stated that Dr. Resnick "never asked the defendant anything about whether she knew it was illegal or a criminal act under man's law to kill J.P. and O.D., regardless of which version of events was to be believed."  The trial court did not find Dr. Resnick's opinion, that the defendant acted under the influence of the shadow's commands, sufficient to establish that she lacked the capacity to appreciate the criminality of her conduct.  The trial court noted that the defendant told Dr. Resnick that, when she was stabbing the children, she knew that she was not supposed to engage in such conduct.

¶ 45    Following the denial of her motion for a new trial, the defendant was sentenced to concurrent terms of natural life in prison for counts I and VI, the intentional first-degree murders of J.P. and O.D.  The defendant was also sentenced to concurrent prison terms of two years for each count of aggravated cruelty.  The sentences for animal cruelty were to be served consecutively to the natural life sentences.  After sentencing, the defendant filed a timely notice of appeal.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, the defendant argues that the trial court's determination, rejecting her affirmative defense of insanity and finding that she did not lack the substantial capacity to appreciate the criminality of her conduct, was against the manifest weight of the evidence.  In Illinois, a person is not criminally responsible for conduct if, at the time of the conduct, she suffered from a mental disease or defect such that she lacked the substantial capacity to appreciate the criminality of her conduct.  720 ILCS 5/6-2(a) (West 2012).  When a defendant raises the affirmative defense of insanity, she bears the burden of proving by clear and convincing evidence

that she is not guilty by reason of insanity, while the State retains the burden of proving the defendant guilty beyond a reasonable doubt. *Id.* § 6-2(e).

¶ 48　　Whether a defendant was sane at the time of an offense is generally a question for the trier of fact. *People v. McDonald*, 329 Ill. App. 3d 938, 946 (2002). A reviewing court will not disturb the trier of fact's resolution on the issue of an insanity defense unless it is against the manifest weight of the evidence. *People v. Frank-McCarron*, 403 Ill. App. 3d 383, 396 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 49　　As the defendant bears the burden of proving insanity, "the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts." *People v. Romero*, 2018 IL App (1st) 143132, ¶ 63. If either party presents expert testimony, "[t]he trier of fact may accept the testimony of one expert over that of another as long as the accepted opinion is based on a credible diagnosis." *McDonald*, 329 Ill. App. 3d at 946.

> "The trier of fact may entirely reject expert testimony if it concludes that the defendant was sane based on factors such as lay testimony based on observations made shortly before or after the crime, the existence of a plan for the crime, and methods undertaken by defendant to prevent detection." *Romero*, 2018 IL App (1st) 143132, ¶ 63.

"Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008).

¶ 50    In the present case, we cannot say that the trial court's determination was against the manifest weight of the evidence.  Dr. Obolsky was an expert in forensic psychiatry and was found qualified to render an opinion on the issue of insanity.  Dr. Obolsky agreed that the defendant suffered from a mental illness, but he opined that she did not lack the substantial capacity to understand the criminality of her conduct at the time she murdered the children.  The trial court's reliance on Dr. Obolsky's testimony was not arbitrary or unreasonable.  Dr. Resnick opined that the defendant lacked the substantial capacity to appreciate the criminality of her conduct, because she was acting under the influence of the black shadow telling her to kill the children.  However, Dr. Obolsky testified that the defendant's description of the black shadow was not a description of an authentic hallucination.  Dr. Obolsky testified that, if the defendant had been having a real hallucination, she would not have claimed that the children saw the black shadow.  He also testified that, if the hallucination were real, the black shadow would have been giving the commands in Polish, defendant's native language, and not English.  Further, her descriptions of the shadow were not consistent over time and, while there could be minor variations if someone were experiencing an authentic hallucination, he concluded that the variations here were not minor.

¶ 51    Further, as the trial court noted one of the factors to consider in determining a defendant's capacity to appreciate the criminality of her conduct are efforts to avoid detection.  Dr. Obolsky testified that his opinion, that the defendant was not legally insane at the time of the murders, was based in part on the efforts she took to avoid detection.  The trial court noted that it found these efforts significant in making its determination.  The evidence showed that the defendant tried to put a knife down the garbage disposal, discarded her cell phone, and made up a story about an intruder.  Dr. Resnick opined that these behaviors merely indicated a fluctuating psychosis, where the defendant was occasionally having rational thoughts.  However, the trial court was entitled to

reject Dr. Resnick's testimony in favor of Dr. Obolsky's testimony. See *People v. McCleary*, 208 Ill. App. 3d 466, 478-79 (1990).

¶ 52    The defendant argues that the trial court's determination is against the manifest weight of the evidence, because the evidence showed that her mental health started declining after her father died, and immediately after the murders she called the church and said that she saw the devil; even the trial court stated that she was in a "psychotic state." Although the evidence supports these assertions, there was still conflicting evidence regarding the defendant's sanity. A trier of fact is not required to confer more weight on a defendant's theory of the case merely because it is a possible alternative to the State's theory; it is the function of the trier of fact, and not a reviewing court, to weigh any discrepancies or inconsistencies in the evidence (*People v. Brown*, 243 Ill. App. 3d 170, 175 (1993)). As there was evidence to support the trial court's determination, the defendant's argument is without merit.

¶ 53    Moreover, while the trial court stated in its ruling that the defendant was in a "psychotic state," the trial court was not finding that she was legally insane. A psychotic, by definition, is someone who is not in contact with reality. *People v. Chatman*, 145 Ill. App. 3d 648, 657 (1986). As the trial court stated, the disconnection from reality could have stemmed from her feelings that she was not appreciated by others or that others were taking advantage of her. The trial court's comment was not an indication that the disconnection was the failure to appreciate the criminality of her conduct at the time of the offenses.

¶ 54    The defendant relies on *People v. Kando*, 397 Ill. App. 3d 165 (2009), for the proposition that her efforts to avoid detection did not mean that she was legally sane. In that case, the defendant, Amir Kando, suffered from schizoaffective disorder, bipolar type, and was taking psychotropic medication. *Id.* at 172. One evening, Kando attacked a neighbor, who lived in the

same apartment complex, with a knife. *Id.* at 172-73. After the attack, Kando fled back to his apartment. *Id.* at 174. At trial, only two experts testified and they both opined that Kando was not sane at the time of the offense and did not understand the criminality of his conduct. *Id.* at 178, 183. The trial court rejected the expert testimony and concluded that Kando was not legally insane at the time of the offense. *Id.* at 193. The reviewing court reversed, holding that there was no basis for the trial court to reject the expert testimony. *Id.* at 197. The reviewing court also rejected the argument that Kando's flight from the scene supported a finding that he was sane at the time of the offense. *Id.* at 205. The court noted that Kando did not appear to flee to ward off detection or destroy evidence but that "[e]veryone agreed that instead of fleeing from the building[,] defendant returned to his apartment in plain and open view, whereupon [*sic*] the arrival of the police, he immediately opened the door, led the officers to the bloody knife, and admitted to stabbing the victim." *Id.*

¶ 55    *Kando* is factually distinct from the present case. Here, there was expert testimony that supported the conclusion that the defendant was sane at the time of the offenses. Also, unlike in *Kando*, the defendant did not have a history of mental illness. In fact, Dr. Obolsky opined that, if the defendant truly had a psychiatric condition, she would have experienced a recurrent manic episode during the five years she had been in jail before the trial. However, jail records indicated that she had not suffered any other serious mental breakdowns while incarcerated. Further, while Kando fled from the scene, he immediately opened the door to the police and led them to the knife. Here, the defendant tried to conceal a knife in the garbage disposal, discarded her phone so she could not be found, and changed her story several times after the murders. Further, instead of going home, she went to Moody's house with the intention of killing Matt and Moody. The defendant argues that if she really had been trying to avoid detection, she would have disposed of

the bodies and would not have said that the attacker appeared to be the devil. However, the fact that her efforts to avoid detection failed does not mean that she was legally insane at the time of the murders. As such, the defendant's reliance on *Kando* is unpersuasive.

¶ 56    The defendant also relies on *Wilson v. Gaetz*, 608 F.3d 347 (7th Cir. 2010), for the proposition that her insane compulsion supported her insanity defense. In that case, the court held that, if " 'there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong.' " *Id.* at 354 (quoting *People v. Schmidt*, 110 N.E. 945, 949 (1915)). The defendant's reliance on *Wilson* is unpersuasive. In *Wilson*, the defendant was a classic paranoid schizophrenic and had an extensive mental health history. *Id.* at 350-52. In this case, although the defendant told the experts that a shadow commanded her to kill the children, Dr. Obolsky found her description of the hallucination and the black shadow to be incredible. The trial court was entitled to accept this testimony over that of Dr. Resnick. See *McCleary*, 208 Ill. App. 3d at 478-79. Moreover, as the trial court noted, the defendant did not state that she received a command to kill the dogs. Further, although the defendant told Kowal that she went to Moody's house with the intent to kill Matt and Moody, she never stated that she received a command to kill them either.

¶ 57    The defendant relies on *People v. Wilhoite*, 228 Ill. App. 3d 12 (1991), for the proposition that the trial court did not give appropriate weight to Dr. Resnick's testimony. In *Wilhoite*, the defendant, Deborah Wilhoite, was charged with attempted murder after she tried to throw her nine-year-old daughter out a window. *Id.* at 14. The defense expert testified that Wilhoite suffered a psychotic episode and "believed the world was coming to an end and that God had commanded her to kill her children so that they could find peace in heaven." *Id.* at 23. The State's expert testified that Wilhoite's behavior was the result of marijuana use and diagnosed her with cannabis

intoxication. *Id.* at 16. The trial court, relying on the State's expert, rejected Wilhoite's insanity defense. *Id.* at 19.

¶ 58 In reversing the trial court's ruling as against the manifest weight of the evidence, the reviewing court noted that the State's expert never ascertained how much marijuana Wilhoite smoked on the day of the incident. *Id.* at 21. Further, the evidence indicated that Wilhoite had smoked marijuana consistently for 10 years and the scholarly authority relied on by all the experts indicated that it would be rare to experience cannabis intoxication after having developed a tolerance to the substance. *Id.* at 23. In addition, while cannabis intoxication normally resulted in anxiety and panic attacks, the evidence indicated that Wilhoite suffered hallucinatory delusions, which were a common symptom of brief reactive psychosis. *Id.* Finally, the reviewing court noted that Wilhoite consistently reported to the arresting officer and every physician who examined her that she was reacting to religious delusions. *Id.* at 24.

¶ 59 We find *Wilhoite* distinguishable in a number of respects. First, the defendant has not cited any scholarly authority or authoritative texts that would negate Dr. Obolsky's theory of the case. Further, unlike Wilhoite's explanation, Dr. Obolsky testified that the defendant's explanations of what happened were not consistent. Although she told officers she saw something "black," the first time she referred to what she saw as a "black shadow" was when she spoke to Dr. Resnick, about 12 days after the murders. Also, unlike the expert in *Wilhoite*, who said that Wilhoite attempted to murder her daughter because she was high on marijuana, Dr. Obolsky did not attribute the defendant's actions to her alcohol withdrawal. He simply opined that alcohol withdrawal looked like symptoms of a psychotic state, which would explain her behavior in jail after the murders. Dr. Obolsky attributed the murders to her depressive disorder and narcissistic personality disorder, which made her feel unappreciated and resentful.

¶ 60    Finally, the defendant takes issue with the trial court's comment that Dr. Resnick never asked her whether she knew that the killings were against "man's law" and she argues that the validity of Dr. Resnick's opinion should not rest upon only one question. While we agree with this assertion, when read in context, it appears that the trial court was merely pointing out a potential shortcoming in Dr. Resnick's evaluation, in response to Dr. Resnick's criticism that Dr. Obolsky did not provide any reasoning for his conclusion that the defendant was legally sane at the time of the offenses. Moreover, we find no reversible error in this comment, as this court reviews the trial court's judgment, not its reasoning; the trial court's judgment may be sustained for any appropriate reason, regardless of whether the trial court relied on those grounds and regardless of whether the trial court's reasoning was correct. See *People v. Johnson*, 231 Ill. App. 3d 412, 419 (1992). As noted, there was sufficient evidence in the record to support the trial court's ultimate determination. Based on the evidence, we cannot say that the opposite conclusion—that defendant was insane at the time of the offenses—was clearly evident. In light of the deference we owe to the trial court, as the trier of fact, we affirm its ruling.

¶ 61                                III. CONCLUSION

¶ 62    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 63    Affirmed.

---

**No. 2-17-1015**

---

| | |
|---|---|
| **Cite as:** | *People v. Plackowska*, 2020 IL App (2d) 171015 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 12-CF-2152; the Hon. Robert A. Miller, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Mary A. Fleming, Assistant State's Attorneys, of counsel), for the People. |

---